KATE E. KING *v.* VICKSBURG RAILWAY AND LIGHT COMPANY.

[42 South. Rep., 204.]

1. EMINENT DOMAIN. *Damage to property. Constitution 1890, sec. 17.*

The constitutional provision, constitution 1890, sec. 17, forbidding the taking or damaging of private property for public use, except on due compensation being first made to the owner in a manner to be prescribed by law, while primarially applicable to eminent domain proceedings, is equally protective of the owner where his property is damaged by a public use without condemnation.

2. SAME. *Due compensation. What.*

Due compensation is what will make the owner whole pecuniarily for appropriating or injuring his property by any invasion of it cognizable by the senses, or by interference with some right in relation to the property, whereby its market value is lessened as the direct result of the public use.

3. NUISANCE. *Damages. Smoke. Cinders. Soot.*

People, although they reside in a city, are entitled to enjoy their homes free from damaging results by smoke, soot and cinders, if sufficient to depreciate the value of their property and render its occupancy uncomfortable.

4. SAME. *Corporation. Legal right.*

A corporation cannot claim exemption from liability for a nuisance maintained by it in the operation of an electric railway power plant whereby private property is damaged because it is operating under a charter giving the right to do the business.

5. SAME. *Action for damages. Distinct causes. Question for jury.*

In an action for damages to plaintiff's property, resulting from noise, smoke and cinders, if the evidence show that plaintiff had been damaged in the manner alleged by the plant of defendant and by a railroad company, it should be left to the jury to determine defendant's liability.

6. SAME. *Former owner.*

If in such case the damage were done to plaintiff's property by the electric plant before it was acquired by defendant, and there has been no continuing cause of damage, maintaining the deprecia-

tion of value, the defendant is not liable; but is liable, where damage was done during former ownership, if the cause of it be continued, and the restoration of value prevented.

FROM the circuit court of Warren county.

HON. GEORGE ANDERSON, Judge.

Mrs. King, the appellant, was plaintiff in the court below; the railway and light company, the appellee, was defendant there.

The suit was for alleged damages to plaintiff's land and dwelling house resulting, as was charged, from smoke, soot, cinders, steam, vibrations and noise created in the operation of defendant's electric power and light plant in the city of Vicksburg. From a judgment in defendant's favor, predicated of a peremptory instruction, the plaintiff appealed to the supreme court.

*Hudson & Fox,* for appellant.

If the appellee in the operation of its power plant, machinery, dynamos, etc., did so in a proper manner, and consistent with the character of business operated, yet if in doing so it interfered with the rights of appellant in the enjoyment and use of her property in a manner that was not suffered by the public generally, it must respond in damages for any injury she may have sustained.

The facts in this case show beyond controversy that the appellant, prior to the location of a power plant, purchased the property described in this case, and with an abiding faith that she could occupy, enjoy and live from the proceeds of her property as comfortably and as free from soot and smoke, vibration and cinders and other foreign substances as any other investor and resident of the city, she made an outlay of her spare cash to reap a competency; and shortly after her purchase this infant octopus, after the lapse of fourteen years, by studious and continuous expansion, becomes the "little drop of water, the little grain of sand that makes the mighty ocean in the land".

to exist and continue to grow, until it becomes "monarch of all it surveys."

The testimony here is that when the plant was first established it was very small, unnoticed and unobjectionable, and no complaint was made, but when the plant grew with the needs of the city, we find the installation of more and heavier machinery to light up the streets. Subsequently additional tons of machinery were attached; then came the displacement of the old machinery, and additional new machinery. With this enlargement, one stack discharged the smoke. However, not being content with this expansion, appellee's predecessor purchased an electric railway franchise and installed about seven miles of system through the streets of Vicksburg, which is now in operation. Since the introduction of this system, in order to operate the same appellee installed more, and heavier, and newer, and larger machinery, and put in two additional boilers, and on account of it being required to burn more coal, appellee then built and has in use an additional smoke stack to meet the volume of smoke.

While these extensions and repairs were being made the plant became more offensive to the peace, quiet and decency of the neighborhood, with its shaking, jarring, queer and screeching noises day and night, and great volumes of smoke and soot raining down upon appellee and her property day and night, breaking the plastering from the houses, jarring the frame work thereof so that the doors and windows became unbalanced and refused to shut, and continuously rattling in their casings, and the water in the cisterns is continuously kept discolored and filthy, so much so until it cannot be used for domestic purposes, and on account of the strong, distasteful coal concoction entering into the water it cannot be drunk; the guttering of the houses is destroyed within two years by the heavy deposit of coal soot, which, when dampened, causes the sulphuric acid to destroy it. Otherwise the life of a tin gutter is twenty (20) years, yet according to the testimony here appellant must re-

place the guttering of her house ten times oftener than those of others in the city.    We find further from the testimony that those who did and who do now occupy these houses and live in the immediate vicinity, are unable to use their own premises to wash any of their clothes on account of the greasy soot that literally fills the air.    During the long, hot summer appellant and her tenants, in order to make life endurable to live there, must keep their front doors and windows shut and sash closed tight in order to keep out the smoke.    How disagreeable and what great quantities of smoke must boil into their houses, when the occupants would prefer the exhausting heat of the summer to the smoke.    Yet, despite these precautions to avoid the penetration of this filth, yet by constant contact with the windows, doors, etc., it does sipe through and soils the curtains and linens of the rooms and beds.

The pharisaical plagues that continually prey upon the peace and comfort of our client are without a good Moses to hold them at bay in order that she may be relieved of her bondage, but it is a never-ending downpour.  Whether her doors and windows fit, whether she has any guttering, any plastering, any water, or can rent her houses, or can use the front porch thereof, or sit on her front gallery without soiling her linens and clothes, she must endure until the plant becomes so obnoxious she must abandon her property and consign it without compensation to appellee, for if appellee continues and meets the requirements of its increasing business, it must assume such proportions as to absolutely drive out our client and her tenants.    Think of the operation of a seven-hundred horse power engine, with two batteries of great boilers consuming five hundred tons of coal in one month, or sixteen tons a day, within eighty feet of your door, constantly belching forth great volumes of smoke and soot and completely overshadowing the surroundings, destroying the atmosphere and paint on the houses, and shaking the very mud cells of the earth as well as the houses.

Because one possesses the aggregation of wealth, does such

possession invest it with the special prerogative to operate without reference to the rights of others? We are informed by innumerable ancient and modern adjudications that such cannot be done; that the right to be protected in one's property, life and liberty cannot be taken away by even constitutional enactment. Such a right is a natural right and is still and always will be unhampered by municipal co-operation.

It occurs to us that the effort of the judiciary, before making a deliverance, is to study existing conditions. For instance, we have *malum in se* and *malum prohibitum.* Since the proclamation of these legal rights the advancement of the ages has made some objects *mala in se* that were formerly *malum in prohibita.*

By way of analogy, let us see how harmless anything may be in its incipiency and finally become a tyrant and a menace. Steam was first discovered in a tea kettle. Its existence was fraught with no more apprehension of interference with natural rights than the invention of letters, yet ingenuity saw its possibilities, and as the age became more strenuous it was put upon wheels and then upon rails, in the shape of vehicles, with a boiler the size of a barrel and freight carriers about the size and capacity of a two-horse wagon. These contrivances, as then operated, interfered with the rights of no one, and every one welcomed their presence; but when Mr. Robert Stevenson invented what is known as "Puffing Billie," with its bells and whistles and other clangor and paraphernalia, then the mischief arose and hell became hitched up in harness, and ever since it has been "a fight of the survival of the fittest" between the people and the railroads, and this little "Puffing Billie," operated at a weight of fifteen thousand pounds, has suddenly assumed the proportions of one hundred and twenty-five tons, and the little cracker boxes that went in its trail now, empty handed, weigh twenty tons, with a capacity of eighty more; and yet the development of this invention is only in its infancy. These concerns charge for the compensation of these grievances by adding

a sufficient per cent to their earnings and expect to pay for them, and why not make them surrender the collection for the interferences with the rights of others? We believe that the American adjudications on this subject finds its origin in Roman civil law, "that you must so use your own as not to interfere with the rights of others." This is a just and wise proverb of the law, and is a great arbiter between neighbor and neighbor, and should always live unfractured or uncompromised by adjudications; otherwise one neighbor's peace is at the mercy of the other. For instance, suppose I am your neighbor, and I erect on my adjoining lot to you a sawmill, a boiler and a blacksmith shop, and produce the injuries to your property that are here complained of; and in addition thereto, by reason of the great noise, you are prevented from holding an ordinary conversation with your family. 'Am I permitted to continue to operate this business, if I show that it is lawfully done and according to established rules prescribed for the operation of such a business, notwithstanding the fact that you are deprived of the use of your own house, your peace and happiness by so doing?

If this must be the legal right, by which rights are to be measured, then I can designedly locate by you and make it lawfully so disagreeable to your habitation as to effect your removal and purchase your valuable estate at a sacrifice. This ruling, we think, would amount to taking one's property without due process of the law.

In our research, in order that we might justly consider this complaint for our client, we have delved into and scrutinized more than a hundred authorities in which this question is pointedly handled, but like one who starts around the world on a direct line, if he keeps on he will come back to the same point he started from. So after reading all authorities we find ourselves back at the basework of this great legal epigram: "*Sic utere tuo ut alienum non lacdas.*" So out of the chaff we have endeavored to gather together the wheat to lessen the labors

of the court, and content ourselves with the following references:

*Hyde Park Thompson-Houston Electric Co.* v. *Porter,* 47 N. E. Rep., 206; *Hulbert* v. *McKeon,* 3 Am. St. Rep., 17; *McKeon* v. *See,* 10 Am. Rep., 659; *Cotton* v. *Onderdonk,* 58 Am. Rep., 556; *Pennsylvania Railroad Co.* v. *Angel,* 56 Am. Rep., 1; *Baltimore & Potomac R. R. Co.* v. *Fifth Baptist Church,* 108 U. S., 739; *Susquehanna Fertilizer Co.* v. *Malone,* (Md.), 25 Am. St. Rep., 595; *Chicago M. & St. P. R. R. Co.* v. *Drake* (Ill.), 35 N. E. Rep., 750; *Louisville & So. R. R. Co.* v. *Hooe* (Ky.), 47 S. W. Rep., 621; *Texarkana & Gainesville R. R. Co.* v. *Hall* (Texas), 14 S. W. Rep., 1047; *Ridge* v. *Pennsylvania R.,* 43 Alt., 275.

When a violation of the public or private right is clear, it will be no defense to show that the thing occasioning the nuisance may be of benefit to the public, nor as a general rule will the courts in civil cases undertake to estimate the difference. 21 Ency. of Law, ed. p. 698.

Section 17 of our constitution provides that:

"Private property shall not be taken or damaged for public use, except on due compensation being first made to the owner or owners thereof, in a manner to be prescribed by law; and whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be public shall be a judicial question, and as such, determined without regard to legislative assertion that the use is public."

However, whatever may be the correct adjudication of the common or Roman law as to the right to recover, manifestly the foregoing section sets at rest and gives the complainant redress for the taking or the damage done to appellee *whether the taking or damage was negligently done or not.* In other words, if it is shown that appellee in the lawful and proper operation of its business, continuously deprives the appellant of the use of her property or interferes with its *physical enjoyment,* and although

she may repair it, yet the same damage will re-occur, then under this section, such act is a taking, and such property is as essential to the existence of appellee as the foundations upon which the boilers and engines rest, and becomes as much of an asset in the hands of the old and the new company as any other property it possessed, and in the sale this right and damage passed and it could not now operate without the use of this property, and has actually seized upon it for its purpose, and business.

While this is a private corporation, operated by its stockholders for private gain, still it is a public utility and as much so as any other railroad and is embraced within sec. 17 of the constitution. *Greenville* v. *Hall,* 14 S. W. Rep., 259; *Vicksburg* v. *Herman,* 72 Miss., 215 (s.c., 16 South. Rep., 434); *Hyde Park Thompson-Houston Electric Light Co.* v. *Porter,* 27 Porter (47 N. E. Rep.), 206; Andrews' American Law, 469; *Cumberland and West End of London Ry. Co.,* 2 Best & South, 605 (110 E. C. L., 604).

Appellee in this case seems to be conjured with the hallucination that because it is performing public functions, it is legally endowed by the legislature with the right to run rough-shod over appellant, and operate its business as explained, and if in doing so it damages her property, her rights must yield to their conduct, no matter how damaging it may be.

We do not so understand the law. Public necessity may justify the damaging, or taking, but cannot justify either, no matter how great, without compensation. The legislature has no power to authorize such taking except for public use, and then only upon providing for just compensation. *Kellogg* v. *New Britton,* 62 Com., 232; *Harding* v. *Slamford Water Co.,* 41 Conn., 87 (54 Am. St. Rep., 664; 1 L. R. A., 296).

*McWillie & Thompson,* for appellee.

The case resolves itself into the inquiry whether the proper construction of an electric railway power house on lands belonging to the appellee, and the carrying on there of business, making

only such noises and confusion and emitting such sparks and smoke as are incident to its business and the proper operation thereof, without intent to injure, gives a cause of action to the owners of adjacent property, because the noises, confusion and smoke annoy the persons of such owners and the sparks endanger their property.

Should the case be decided against the appellee, it will be very difficult and exceedingly expensive for new public enterprises, such as railroads, to be constructed into, through or near a city or town, because if plaintiff, whose property adjoins defendant's lands, can recover in this case, all owners of property within hearing of a railroad's bells and whistles can recover; the difference being not in right but in mere degrees of damage. The court will find it very difficult to draw the line and say where liability ends unless it does so at the beginning and adjudges that, where property is not taken, recovery can be had only for damages where physical injury is done to the property itself. We cannot believe that the constitution makers intended to retard public improvements. The constitution applies to the state, municipalities, and levee boards, as well as to public utility corporations, and all must stand on the same plane.

Before the words, "or damaged," were inserted into recent constitutional provisions on the subject of the taking of property for public use, it was held in many jurisdictions that parties exercising the right of eminent domain and taking property for public use had greater rights after acquiring the property with respect to its use than other persons. Sedgwick, a great lawyer, in his work on Statutory and Constitutional Law (1st ed., 579; 2d ed., 456), says: "It seems to be settled that, to entitle the owner to protection under this clause (meaning the constitutional provision that private property should not be taken for public use without due compensation, etc.), the property must be actually taken in the physical sense of the word, and that the proprietor is not entitled to claim remuneration for indirect or consequential damages, no matter how serious and how clearly

and unquestionably resulting from the exercise of the power of eminent domain. · This rule has been repeatedly declared in many of the states of the Union." The author cites many cases from New York, Pennsylvania, Connecticut, Massachusetts, Maine and Vermont; and proceeds to say (reformer as he was) : "To differ from the voice of so many learned and sagacious magistrates, may almost wear the aspect of assumption; but I cannot refrain from the expression of the opinion that this limitation of the term *taking* to the actual physical appropriation of property or a divesting of the title is, it seems to me, far too narrow a construction to answer the purposes of justice, or to meet the demands of an equal administration of the great powers of government. ∴ . . But the matter can only be now remedied by the insertion of carefully drawn clauses in our legislative acts, which shall give to property the full protection that the constitutional guarantee has failed to secure." We have quoted liberally to show the state of the law (1857) when Sedgwick wrote.

The author's writings (as is the case in several marked instances) bore fruit. The courts, and not the legislatures alone, began to enlarge the rights of property owners. The most noted instance of this advancement by the courts was made by the supreme court of New Hampshire in 1872, in the case of *Eaton* v. *Railroad Co.,* 51 N. H., 504. The case was one which presented two marked characteristics. First, while there was no taking there was a physical injury to the land itself, a physical interference with the rights of property, an actual disturbance of the plaintiff's possession. Second, the facts made out a case in which the damages could have been recovered had a private person done what the railroad did. The court decided that the railroad was liable, because of the two characteristics just mentioned, and thereby put itself in the lead of a line of decisions holding that, although there was no actual divestiture of title or actual appropriation, yet recovery could be had if there was a physical injury and the facts were such that a private individual would be liable had he done what the party exercising the right

of eminent domain did in the premises.    Many courts still stood
by the old rule, so severely criticized by Sedgwick, and this was
the state of the law when the constitution makers of several states
(Illinois as early as 1870), including our own in 1890, amended
the constitutional clause by the insertion of the words, "or dam-
aged."    The purpose was to adopt the New Hampshire doctrine,
which Sedgwick thought could only be done by legislation.    The
words, "or damaged," extended the scope of compensation, of
course, but it was intended to embrace only cases of physical
damage to property not taken, and to place railroads, cities, the
state, and others exercising the right of eminent domain, on ex-
actly the same plane as private individuals.

What does the word "damaged," as used in the constitution,
mean?    We must construe it in a legal sense.    A depreciation
in value is not always a legal damage.    In a popular sense it
may be, and that, too, whether the depreciation be caused by a
legal or an illegal act; but when a word is used in a constitution
or statute it relates to an actionable wrong.    The use of the word
in the constitution gives the owner of property compensation for
an actionable wrong and nothing more; it does not give him com-
pensation for depreciation in value caused by a legal act, since
in law such an act is innocent, and therefore, if not actually
harmless, is *damnum absque injuria.*    There is nothing in the
language of the constitution which shows an intent to enlarge
the legal meaning of the word "damaged," nor anything to indi-
cate that it was used with a view of changing the substantive law
of damages, or of making that actionable which before was non-
actionable.    There was no intent to abolish the *damnum absque
injuria* rule.    The purpose was to make the law uniform so that
a recovery could be had against a city or a railroad in every case
where the sufferer could have recovered againts parties who did
not have the power of eminent domain.    To illustrate: under
the old constitution, if a cotton factory company had obstructed
a street, thereby inflicting special damages, a property owner so
damaged could have recovered; but if the same acts had been

done by a city under its charter, the damage to the property owner would have been the same, but he could not have held the municipality liable because the charter right to obstruct the street would have been legal authority for what was done. The constitution, by the use of the word "damaged," took away the city's exemption and placed it exactly on the same plane as that occupied by a private person, thereby providing that damages, even if for public purposes and by whomsoever caused, shall be paid for, etc. But it meant damages in a legal sense. Under the present constitution, whatever is damage by one is damage by all, and what is *damnum absque injuria* to one is so to all.

If a land owner by building a wall on his own premises diminishes the market value of his neighbor's house by obstructing light and air, he is under no obligation to make good the depreciation. He had a right to build his wall, and in a legal sense he has not by so doing damaged his neighbor. So, too, if a city erects a public building and cuts off the same light and air, it would not be liable, for it had the right to build, and it did not in a legal sense damage the adjacent landowner. See *Quintini* v. *Bay St. Louis,* 64 Miss., 483.

These views could be almost indefinitely elaborated, but elaboration is deemed unnecessary. They culminate in the conclusion that parties having the power of eminent domain now occupy by virtue of the new constitutional provision exactly the same position as private land owners, and are deprived of the more advantageous position which they occupied under the old constitution. Unless, therefore, the plaintiff has made a case which would entitle her to a recovery against a factory company or private individual, she cannot recover against the appellee.

According to the record the appellee has done no wrongful or unlawful act. It took no property; it invaded no right. If plaintiffs' property was diminished in value by what appellee did, it was caused by the lawful operation of defendant's machinery on its own private property. If a great manufacturing plant had been erected on the very ground upon which the

electric plant is located, the market value of plaintiffs' property might have been greatly injured.    Properly erected and conducted factories and business houses in close proximity to residences frequently cause depreciation in values and in a popular sense damage, but in such cases the annoyances and inconveniences are not actionable because they arise from lawful uses. The owners of the establishment are as much entitled to the use and enjoyment of their property as are the owners of the residences, and in the case before the court, the appellee is as much entitled to the use and enjoyment of its plant as plaintiff is entitled to the use and enjoyment of her residence.    Take the case of an ordinary steam railroad; it cannot be denied but that in a popular sense the close proximity of residences to its tracks damages the railroad property.    They obstruct the view; they occasion the going upon the track of persons and domestic animals, and increase the necessity for vigilance in the management of trains.    Now, suppose the railroad had been constructed before the residence, would the owner thereof be liable to the railroad company for the inconveniences accruing from the erection of the dwelling, its occupation by a large family of persons, and the inconvenience and necessity of extra care resulting therefrom to the railroad company?    Most assuredly not; and because the building upon and occupation of his property would be lawful uses.    If, as we contend, the new constitution places parties having the power of eminent domain on the same plane with other persons, the rights and liabilities of the parties are thoroughly mutual.

When does liability arise?    It arises when either so conducts their affairs as to create a nuisance, and not before.    If the acts complained of do not amount to a nuisance, there is neither legal nor moral wrong done.    Of course, the private business of a public utility corporation may be so conducted as to create a nuisance, and in such case it would be liable to parties specially injured, but the law of nuisances, apart from the question or "taking" or "damaging" of private property for public use, must

be applied to such cases, and the law of nuisances, so considered, must be applied to this case. A railroad, even one belonging to and operated by a private person, is not a nuisance *per se.* And the same is true of an electric power and light plant. Pierce on Railroads, 2; 1 Rorer on Railroads, 8; *Geiger* v. *Filor,* 8 Fla., 332; *Randall* v. *Ry. Co.,* 19 Fla., 409; *Bell* v. *Railroad Co.,* 25 Pa., 161 (s.c., 64 Am. Dec., 687); *Hentz* v. *Railroad Co.,* 13 Barb., 646; *Drake* v. *Railroad Co.,* 7 Barb., 508; 6 Rapalje & Mack's Ry. Digest, 886 (2). The annoyance arising from the necessary use of a railroad or from an electric plant is not a nuisance. *Bell* v. *Railroad Co., supra.* It will be observed that what was done by the appellee in this case was necessary to be done in its lawful business; it could not, therefore, have constituted a nuisance and was not a nuisance.

The opinion of Chief Justice SIMMONS, of the supreme court of Georgia, in the case of *Austin* v. *Railroad Co.,* 47 L. R. A., 755, so admirably present our contentions that we adopt it as a part of this brief and invite the most careful consideration of it.

There is, however, a view arising from the language of the constitution which we wish to emphasize. The constitution requires that compensation shall be *first* made, alike for the taking and damaging of private property. Give full force in the mind to the word *first.* The word is used not alone for the benefit of the owner whose land is taken, but for all else it means in the sentence. Damages that can be *first* paid for, are those which can be ascertained at the time, before the construction of the public work, and includes only such damages as certainly, directly and inevitably flow from their construction. Suppose a new street or a new railroad is laid out under a condemnation proceeding on the supposition of a moderate or ordinary bulk of business being done upon it, and suppose afterwards there is an enormous increase in the business, what then? Is the party injuriously affected entitled to more damages? Where will the thing end?

Noise and smoke and vibrations do not amount to a physical

invasion of or legal damage to property.    If they do, how much noise and how much smoke and what extent of vibration is required to give a right of action ?    The least noise and the most infinitesimal quantity of smoke and the slightest vibration would be sufficient for the recovery of nominal damages.    Public utility companies would not alone be liable, but factories of all kinds and private persons as well.    The smoke from your own chimneys may settle in a neighbor's yard and subject you to suits.    If the necessary noise made by an electric power and light plant in the proper conduct of its business subjects it to an action, then any noise whatever, by whomsoever made, would be cause of at least nominal damages.    Every one within the circle affected by noise or smoke would have a cause of action against the party making the noise, however useful the trade carried on, or causing the smoke, without reference to the business in which it was emitted.    Noise and smoke may cause personal inconvenience, but they do not physically damage land.    And so of vibrations.    Men of science tell us that there never was a word spoken or a blow struck that did not set in motion vibrations that are unending.    They reach to the end of the earth.    A sensitive person can feel vibrations in houses caused by the passage of a railroad train on a track a quarter of a mile away.    The vibrations are not so readily perceived, but they are caused, at much greater distances.    Rights of action do not depend upon the extent of damage, and if noises, smoke and vibrations give rise to actions it is impossible to place a limit upon them.

The law therefore, we think, wisely denies all right of action for such things unless the party sought to be charged has been guilty of a nuisance; and if the noises, smoke and vibrations complained of result from the necessary management of a lawful business, a right of action cannot be predicated thereof, since it is not a nuisance to carry on a lawful business in a lawful way.

In the case of *Baltimore, etc., Railroad Co.* v. *Baptist Church,* 108 U. S., 317, the law of nuisances, pure and simple, was applied to a railroad.  There it was adjudged that the business

carried on in the roundhouse was so conducted as to make it a nuisance; the chimneys of the roundhouse were very near to and lower than the windows of the church, and belched forth great volumes of smoke into the house of worship. Justice FIELD, in that case, said: "Undoubtedly a railroad over the public highways (and streets) . . . may be authorized by congress (the church was in Washington City), and if, when used with reasonable care, it produces only that incidental inconvenience which unavoidably follows the additional occupation of the streets by its cars, with the noise and disturbance necessarily attending their use, no one can claim that he is incommoded. Whatever consequential annoyance may necessarily follow from the running of cars on the road with reasonable care is *damnum absque injuria.* The private inconvenience in such case must be suffered for the public accommodation." If the company would not be liable for its road so operated in a street, certainly appellee could not be for its operation of its plant on its own private property.

We append a list of authorities which we think maintain our view:

1. Injuries to property arising out of and incident to the careful operation of a properly constructed public utility plant or railroad are *damnum absque injuria.* *Lake Street, etc., Railroad Co.* v. *Brooks,* 90 Ill. App., 173; *Illinois, etc., Railroad Co.* v. *Grabill,* 50 Ill., 241, 244; *Fairbanks Co.* v. *Nicolai,* 167 Ill., 242, 248; *Chicago* v. *Union Stock Yards Co.,* 164 Ill., 224, 235; *Chicago, etc., Railroad Co.* v. *Joliet,* 79 Ill., 25; *Chicago, etc., Railroad Co.* v. *Cogswell,* 44 Ill. App., 388; *Chicago, etc., Railroad Co.* v. *Hall,* 90 Ill., 42; *Rigney* v. *Chicago,* 102 Ill., 64; *Chicago* v. *Union, etc., Ass'n,* 102 Ill., 379; *Chicago, etc., Railroad Company* v. *Ayers,* 106 Ill., 511; *Parker* v. *Catholic Bishop,* 146 Ill., 158; *East St. Louis* v. *O'Flynn,* 119 Ill., 200; *Chicago* v. *Burcky,* 158 Ill., 103; *L. E. & W. Railroad Co.* v. *Scott,* 132 Ill., 429; *Frazer* v. *Chicago,* 186 Ill., 480; *Stone* v. *Railroad Company,* 68 Ill., 394; *Chicago, etc., Railroad Co.* v.

*McGinnis,* 79 Ill., 269; *Roebling* v. *Trenton, etc., Ry. Co.,* 58 N. J. L., 666 (s.c., 34 Atl. Rep., 1090); *Thompson* v. *Pennsylvania, etc., Railroad Co.,* 51 N. J. L., 42 (s.c., 15 Atl. Rep., 833); *Beseman* v. *Railroad Co.,* 50 N. J. L., 253 (s.c., 13 Atl. Rep., 164); *Bridge Co.* v. *Geisse,* 35 N. J. L., 558; *Louisville, etc., Railroad Co.* v. *Hooe,* 18 Ky. L. Rep., 521; Randolph's Eminent Domain, sec. 154; *Peel* v. *Atlanta,* 85 Ga., 138; *Austin* v. *Augusta, etc., Railroad Co.,* 34 S. E. Rep., 852 (s.c., 47 L. R. A., 755); *Trinity, etc., Railroad Co.* v. *Meadows* (Texas), 11 S. W. Rep., 145; *Proprietors, etc.,* v. *Nashua, etc., Railroad Co.,* 10 Cush. (Mass.), 385; *Presbry* v. *Railway,* 103 Mass., 1; *Rochette* v. *Railway* (Minn.), 20 N. W. Rep., 140; *Rude* v. *St. Louis* (Mo.), 6 S. W. Rep., 257; *Jordan* v. *Benwood,* 42 W. Va., 312 (s.c., 26 S. E. Rep., 266; 36 L. R. A., 519); *Pennsylvania, etc., Railroad Co.* v. *Marchant,* 119 Pa. St. Rep., 541; *Gilbert* v. *Greeley, etc., Railroad Co.* (Colo.), 22 Pac. Rep., 814; *Ruckert* v. *Grand Avenue, etc., Ry. Co.* (Mo.), 63 S. W. Rep., 814 (s.c., 22 Am. & Eng. Ry. Cases [N. S.], 641).

2. The constitution of 1890 placed a public or quasi public corporation upon the same footing with relation to the use of its property as that of a private owner, with respect to adjacent property. That is, its liability is the same, under the constitution, as that of a private owner at common law. *Rigney* v. *Chicago,* 102 Ill., 64, 81; Randolph's Eminent Domain, sec. 154; *Trinity, etc., Ry. Co.* v. *Meadows* (Texas), 11 S. W. Rep., 145; *Jordan* v. *Benwood,* 42 W. Va., 312 (s.c., 36 L. R. A., 519); *Rude* v. *St. Louis,* 93 Mo., 408 (s.c., 6 S. W. Rep., 257); *Bridge Co.* v. *Geisse,* 35 N. J. L., 558; *Austin* v. *Augusta, etc., Ry. Co.* (Ga.), 34 S. E. Rep., 852 (s.c., 47 L. R. A., 755); *Peel* v. *Atlanta,* 85 Ga., 138; *Pennsylvania, etc., Railroad Co.* v. *Marchant,* 119 Pa. St. Rep., 541.

3. Under the constitution of 1890 there must be physical interference either with the land or some right growing out of or connected with the land, which the owner enjoys in connection

with his property, and which gives to it an additional value, or he cannot recover of a railroad company for damages to it. *Rigney* v. *Chicago,* 102 Ill., 64, 80, 81; *Austin* v. *Augusta, etc., Railroad Co.* (Ga.), 34 S. E. Rep., 852 (s.c., 47 L. R. A., 755).

4. Mere inconvenience in the use of property caused by the proximity of a public improvement forms no basis of a recovery for damages, even though the property may be diminished in value. *Stone* v. *Railroad Co.,* 68 Ill., 394; *Chicago* v. *Union, etc., Co.,* 164 Ill., 224; *Chicago, etc., Railroad Co.* v. *Hall,* 90 Ill., 42; *Parker* v. *Catholic Bishop,* 146 Ill., 158; *Gilbert* v. *Greeley, etc., Railroad Co.,* 22 Pac. Rep. (Colo.), 814; *Proprietors, etc.,* v. *Nashua, etc., Railroad Co.,* 10 Cush. (Mass.), 385; *Presbrey* v. *Ry. Co.,* 103 Mass., 1; *Rude* v. *St. Louis,* 6 S. W. Rep. (Mo.), 257.

5. Noise and smoke and vibrations necessary to the operation of a public improvement are mere inconveniences to persons and are not an interference with a property right growing out of the land. *Stone* v. *Railroad Co.,* 68 Ill., 394; *Presbrey* v. *Ry. Co.,* 103 Mass., 1; *Chicago, etc., Railroad Co.* v. *Hall,* 90 Ill., 42; *Austin* v. *Augusta, etc., Railroad Co.,* 22 Pac. Rep. (Ga.), 852 (s.c., 47 L. R. A., 755); *Proprietors, etc.,* v. *Nashua, etc., Railroad Co.,* 10 Cush. (Mass.), 385; *Lake, etc., Railroad Co.* v. *Brooks,* 90 Ill. App., 173.

6. Where the damage is the same kind, only differing in degree from that suffered by the general public, there can be no recovery by a private individual. *Chicago* v. *Union, etc., Co.,* 102 Ill., 64; *Brainard* v. *Conn.,* 7 Cush. (Mass.), 506; *Shaw* v. *Boston, etc., R. R. Co.,* 53 N. E. Rep., 92 (s.c., 157 Mass.); *Chicago, etc., Railroad Co.* v. *Ayres,* 106 Ill., 511; *Parker* v. *Catholic Bishop,* 146 Ill., 158; *East St. Louis* v. *O'Flynn,* 119 Ill., 200; *Chicago* v. *Burcky,* 158 Ill., 103; *Geibert* v. *Greely, etc., Railroad Company,* 22 Pac. (Colo.), 814; *Rochette* v. *Chicago, etc., Railroad Co.,* 20 N. W. Rep. (Minn.), 140; *Rude* v. *St. Louis,* 6 S. W. Rep. (Mo.), 257; Wood on Nuisances, 718.

7. To authorize a recovery, it must be affirmatively shown by

the parties seeking to recover that the public improvement was not properly constructed or was not operated in a careful manner. *Lake, etc., Railroad Co.* v. *Brooks,* 90 Ill. App., 173; *Louisville, etc., Railroad Co.* v. *Hooe,* 18 Ky. L. Rep., 521.

8. Constitutional or statutory provisions of other states similar to the provision of sec. 17, Mississippi Constitution of 1890.

COLORADO Const., 1876, art. 2, sec. 15: "That private property shall not be taken or damaged, for public or private use, without just compensation." *Geibert* v. *Greely, etc., Railroad Co.,* 22 Pac. Rep., 814.

GEORGIA Const., 1877, art. 1, sec. 3: "Private property shall not be taken or damaged for public purposes without just and adequate compensation being first paid." *Peel* v. *Atlanta,* 85 Ga., 138; *Austin* v. *Augusta, etc., Railroad Co.,* 34 S. E. Rep., 852 (s.c., 47 L. R. A., 755).

ILLINOIS Const., 1870, sec. 13: "Private property shall not be taken or damaged for public use without just compensation, etc." See authorities under paragraph 1.

KENTUCKY Const., 1891, sec. 242: "Municipal and other corporations and individuals, invested with the privilege of taking private property for public use, shall make just compensation for property taken, injured or destroyed by them, etc." *Louisville, etc., Railroad Co.* v. *Hooe,* 18 Ky, Law Rep., 521.

MASSACHUSETTS, General Statutes, chap. 63, sec. 21: "Railroad companies shall pay all damages occasioned by laying out and making and maintaining their roads, as well as by taking land." *Proprietors, etc.,* v. *Nashua, etc., Railroad Co.,* 10 Cush., 385; *Presbrey* v. *Old Colony, etc., Railroad Co.,* 103 Mass., 1.

MISSOURI Const., 1875, art. 2, sec. 21: "Private property shall not be taken or damaged for public use without just compensation." *Rude* v. *St. Louis,* 6 S. W. Rep., 257; *Ruckert* v. *Grand Avenue Ry.,* 63 S. W. Rep., 814 (s.c., 22 Am. & Eng. Ry. Cases [N. S.], 641).

NEBRASKA Const., 1875, art. 1, sec. 21: "The property of no person shall be taken or damaged for public use without just compensation therefor." *Omaha* v. *Kramer,* 25 Neb., 489.

NEW JERSEY, Special Act, Laws 1839, p. 151, providing for damages for injuries by erection of bridge. *Bridge Co.* v. *Geisse,* 35 N. J. L., 558.

PENNSYLVANIA Const., 1873, art. 16, sec. 8: "Municipal and other corporations and individuals invested with the privilege of taking private property for public use shall make just compensation for property taken, injured or destroyed by the construction or enlargement of their works, highways or improvements, which compensation shall be paid or secured before such taking, injury or destruction." *Pennsylvania Railroad Co.* v. *Marchant,* 119 Pa. St. Rep., 541.

TEXAS Const., 1876, art. 1, sec. 17: "No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person," etc. *Trinity, etc., Railroad Co.* v. *Meadows,* 11 S. W. Rep., 145.

WEST VIRGINIA Const., 1872, art. 3, sec. 9: "Private property shall not be taken or damaged for public use without just compensation." *Jordan* v. *Benwood,* 42 W. Va., 312 (s.c., 36 L. R. A., 519).

*Smith, Hirsh & Landau,* on the same side.

The main question in this case is, can a quasi public corporation, an electric light and railway plant, operating under a franchise granted by the city of Vicksburg an electric railway upon the streets of said city, and charged with the duty to supply electric light and power to said city, and its inhabitants, operating its plant with skill, prudence and utterly without negligence, using only approved machinery, and employing competent engineers and others in the operation of said plant, be destroyed by permitting owners of property in that locality to maintain

suits for damages and recover therein, because such property owners suffer the inconvenience, or damage, resulting from the smoke, soot, cinders, steam, vibration and noise created in the necessary, diligent and legitimate operation of said electric light plant?

We do not deem it necessary to review all the cases on this subject or to pursue the ramifications incident to the diverging line of decisions.    Whatever may be the view of some courts, we respectfully contend that the best reasoned and most authoritative cases uphold the right of this defendant conducting a lawful business in a lawful way to be protected from ruin resulting from damages recovered in suits based upon the complaint that said plant is emitting smoke, soot, and steam and producing vibrations and noises, and thereby causing inconvenience to property holders in that locality.

The clause in the constitution (sec. 17) relating to damage done to property does not materially affect the subject now under consideration.

It is elementary, of course, that in order to form society individuals surrender certain natural rights.    Man in a state of nature is one person and man in a civilized community is another person, so far as his civil rights are concerned.

When people live on farms and fields they have certain privileges relative to the enjoyment of the air, free use of light and the protection from noxious odors, which are unassailable. When they move to a city, and enjoy the benefits of fire protection, police surveillance, the use of artificial ice, speedy transportation by means of electric power along the streets; the soothing and somnolescent influences of stationary fans operated by electricity, and the numerous conveniences and luxuries peculiar to the present development of urban life, they necessarily, if they do not voluntarily, surrender some of those privileges so dear to them when the air is rendered fragrant and healthful by the exhilarations of the pine, musical with the gurgling currents

of running water, and cooled by the unobstructed breezes from summer seas.

The principles which the appellee invokes to maintain its right to exist and discharge its public functions are stated with great cogency, clearness and force by the courts of at least seven states, to wit: Georgia, Iowa, Massachusetts, Minnesota, New Jersey, Pennsylvania and Wisconsin, and as we interpret it, the rule is also the same in Kentucky, thus showing that the principle is circumscribed by no sectional lines, and is recognized not only by those numbered among the original thirteen states, but by states of a recent creation.

GEORGIA. In *Austin* v. *Augusta Terminal Railway Company,* 47 L. R. A., 755 (34 S. E. Rep., 852), the supreme court of Georgia held:

"To 'damage' property, within the meaning of the constitution, there must be some physical interference with property, or physical interference with a right or use appurtenant to property; and therefore a railway company is not liable to the owner of real property for diminution in the market value thereof, resulting from the making of a noise, or from the sending forth of smoke and cinders, in the prosecution of the company's lawful business, which does not physically affect or injure the property itself, but merely causes personal inconveniences or discomfort to the occupants of the same."

It is to be noted that the provisions of the Georgia constitution are practically the same as sec. 17 of the constitution of Mississippi.

The Georgia court found, as a matter of fact (p. 757) that the plaintiff's premises were not "damaged by reason of any means of access, right of way, or easement, remote or near at hand, being physically interfered with, invaded or disturbed," and found that the real claim for damages to the property was based upon "personal inconvenience or discomfort to the occupants of the same."

In the case at bar the claim is, and therefore evidence was introduced in the attempt to sustain that claim, that "the property has been reduced in value."

In a later case, decided August 9, 1902—*George, etc., Co.* v. *Maddux,* 42 S. E. Rep., 315—the court adhered to this ruling and held: "Where a railroad terminal yard is located, and its construction authorized, under statutory power, if it be constructed and operated in a proper manner, it cannot be adjudged a nuisance. Accordingly, injuries and inconveniences to persons residing near such a yard, from noises of locomotives, rumbling of cars, vibrations produced thereby, and smoke, cinders, soot and the like, which result from the ordinary and necessary, therefore proper, use and operation of such yard, are not nuisances, but are the necessary concomitants of the franchise granted. The terminal yard, the operation of which is sought to be enjoined in this case, was located and its operation authorized, under statutory powers."

IOWA. In *Dunsmore* v. *Central Iowa R. R. Co.,* 33 N. W. Rep., 456, the court said: "The annoyance caused to one residing on property ninety-three feet distant from the right of way of a railroad company, but not abutting thereon, by a coal chute within the right of way, is not the subject of damages where the chute had been properly built, and is operated in the usual and customary manner," and (p. 457): "Railroads cannot be operated without fuel, and proper structures for supplying engines therewith are necessary to be maintained at convenient points for the purpose. They are necessarily incidental to the operation of the road. The owners of property in the vicinity of a railroad necessarily suffer inconvenience, such as detention by trains upon the track, the noise of passing trains, the smoke emitted from engines and the like, for which they cannot recover in a suit for damages. Pierce on Railroads, 216; Ror. on Railroads, 457; *Randle* v. *Pacific Ry. Co.,* 65 Mo., 325; *Parrot* v. *Railway Co.,* 10 Ohio St. Rep., 624; *Cosby* v. *Railway Co.,* 10 Bush., 288; *Strothers* v. *Railway Co.,* 87 Pa. St. Rep., 282.

MASSACHUSETTS.   In *Sawyer* v. *Davis,* 49 Am. Rep., 27, the
court said: "It is accordingly held in many cases, and is now a
well established rule of law, at least in this commonwealth, that
the incidental injury which results to the owner of property
situated near a railroad, caused by the necessary noise, vibration,
dust and smoke from the passing trains, which would clearly
amount to an actionable nuisance if the operation of the railroad
were not authorized by the legislature, must if the running of
trains is so authorized, be borne by the individual without com-
pensation or remedy in any form.    The legislative sanction
makes the business lawful, and defines what must be accepted
as a reasonable use of property and exercise of rights on the part
of the railroad company, subject to the qualification that the
business must be carried on without negligence or unnecessary
disturbance of the rights of others.    And the same rule extends
to other causes of annoyance which are regulated and sanctioned
by law."

The Massachusetts statute provides for allowance for all dam-
ages, etc.    General Statutes, 63, sec. 21; *Prespry* v. *Old
Colony, etc., R. R. Co.,* 103 Mass.

MINNESOTA.   In *Carroll* v. *Wisconsin, etc., R. R. Co.,* Sup.
Court Minnesota, February 11, 1889, 41 N. W. Rep., 661, it
was held: "No action lies against a railroad company for the
inconveniences necessarily caused to premises in the vicinity by
noises, smoke, jarring of the ground, etc., arising from property
and prudently operating its railroad upon its own lands, or upon
land in which the party complaining has no interest," and "it is
well settled that, where there is no taking of or encroachment on
one's property or property rights by the construction and opera-
tion of a railroad, any inconvenience caused by it, as from noises,
smoke, cinders, etc., not due to improper construction, or negli-
gence, in operating it, furnish no ground of action, as when the
railroad is laid wholly on land which the company has acquired
by purchase or condemnation.    We are not cited to any case
deciding the contrary of this proposition, nor do we know of any.

Railroads are a public necessity. They are always constructed and operated under authority of law. They bring to the public great benefits; to some persons more, to other persons less. The operating of them in the most skillful and careful manner causes to the public necessary incidental inconveniences, such as noise, smoke, cinders, vibrations of the ground, interference with travel at the crossings of roads and streets and the like." And then finally: "No law ever proposed to give indemnity for all losses occasioned by the construction of railroads and other public improvements; if it did, it would extend indefinitely."

In the later case of *Romer* v. *St. Paul City Ry. Co.,* 77 N. W. Rep., 825, it appears: "The defendant has for some years maintained and operated by public authority a street car system, the motive power of which is electricity, in the city of St. Paul. As a necessary incident to such operation, it has maintained a car barn in a residence district, for the purpose of storing a part of its cars when not in use on the streets. The barn fronts on Ramsey street, with its sides abutting on Thompson and Smith avenues, respectively. It is not authorized to operate its system on these avenues, but it has without any negligence in the premises laid its tracks and curves thereon, over which it runs, from early in the morning until late at night, its cars to and from the barn. Such operation of its cars over such tracks and curves causes loud and disagreeable noises, whereby the rest and comfort of the plaintiff are disturbed and the rental value of his real estate abutting on the street and avenues is materially reduced. Held: Construing the city ordinance granting to the defendant the right to operate its street car system that it is authorized to lay and operate the tracks and curves on the avenue." The court said: "But there is a radical difference between an ordinary commercial railway operated by steam and a surface street railway, operated by electricity, as to the selection of its roundhouse and machine shops by the one, and its car barns by the other. In each case the selection must be made with reference

to the rights of property owners in the neighborhood; also, those of the railway company and of the public.    The rights and convenience of property owners cannot alone be considered for one living in a city must necessarily submit to the annoyances which are incidental to urban life, and individual comfort must in many cases yield to the public good.    Now, the only ground for claiming in this case that the location of the defendant's car barn was an improper one is that it is in the residence portion of the city.    But the exclusive business of the defendant is the carrying of passengers within the limits of the city and in its streets. Its lines traverse the streets of the residence portion of the city. Its business is there.    It takes on and discharges passengers in all parts of the city.    It must have its car barn so located that it can promptly get its cars upon its lines for the purpose of enabling the people of the city to reasonably get from their homes to the respective places of business or labor.    It cannot locate its barns outside of the city, because it is only authorized to build and operate its lines within the city limits and upon its streets, and if it had the authority to do otherwise, it would be impracticable and detrimental to public interests to do so.    Again, if it locates its barns at points where there are at present no dwelling houses, it is only a matter of time when some property owner will be disturbed by the loud and disagreeable noises necessarily occasioned by taking its cars in and out of the barns.    The rights of such an owner are the same as those of the plaintiff."

NEW JERSEY.    In *Thompson* v. *Pennsylvania R. R. Co.,* 15 Atl. Rep., 833, it was held: "In an action against a railroad company for damage to an adjacent land owner caused by noise, smoke and stench, arising from the unlawful management of defendant's road, evidence as to the difference between the value of the property with and without the railroad is irrelevant, since the amount of injury caused by the lawful operation of the road is *damnum absque injuria."*

In *Besemen* v. *Pennsylvania R. R. Co.,* 13 Atl. Rep., 164, the

court held: "A railroad company is not responsible for the inci-
dental damages occasioned to land abutting on or near to the
track; the road being run, in all respects, with care and skill."
This case was affirmed in the court of errors and appeals in 1890,
20 Atl. Rep., 169.

In New Jersey they have a special act providing for damages,
etc.     Special act, Laws 1839, p. 151; *Bridge Co.* v. *Geisse,* 39
N. J. L., 558.

PENNSYLVANIA.     In *Jones* v. *Erie, etc., R. R. Co.,* 25 Atl.
Rep., 134, the supreme court of Pennsylvania held: "The incon-
venience caused by the smoke, dust, and noise of passing trains
is *damnum absque injuria."* The court said: "The business
authorized by the charter of a railroad corporation is the carriage
of persons and goods.     The work of construction is provided as
an indispensable preliminary.     A road must be built before it
can be operated.     The manner and purpose of construction are
to be considered in determining questions relating to damages,
but in the operation of its road a company is liable only for neg-
ligence or malice.     Smoke, dust and noise are the usual, and in
the present state of knowledge on the subject, the necessary con-
sequence of the use of steam and the movement of trains, just as
noise and dust are the consequences of the movement of drays
and carts over the ordinary highway.     The resulting incon-
veniences and discomforts are in both cases *damnum asbque
injuria.     Railroad Co.* v. *Lippincott,* 116 Pa. St. Rep., 476
(9 Atl. Rep., 871); *Railroad Co.* v. *Marchant,* 119 Pa. St.
Rep., 541 (13 Atl. Rep., 690).

In Pennsylvania the constitution of 1873 provides: "Munic-
ipal and other corporations and individuals invested with the
privilege of taking private property for public use shall make
just compensation for property taken, injured or destroyed, by
the construction or enlargement of their works, highways or
improvements, which compensation shall be paid or secured
before such taking, injury or destruction."     *Penn. R. R. Co.* v.
*Marchant,* 119 Pa. St. Rep., 641.

Kentucky. Kentucky has a clause in its constitution substantially like the constitution of Mississippi. In *Louisville, etc., R. R. Co.* v. *Foster,* 50 L. R. A., 813, the court said: "The proof of appellant tended very strongly to show that there was no more noise or disturbance at the turntable than there is ordinarily incidental to the operation of an electric street car line in a city, and must be borne by the abutting property owners in connection with the benefits which they derive from the street railway, and the other uses to which the highway is put." And the court said: "The owner of property abutting on a city street near a street railway turntable cannot recover damages under sec. 242 of the constitution authorizing compensation for property 'injured' by reason of the location and operation of a street railway turntable, and the noises, smells and disturbances that are reasonably incidental to the operation of a street railway in a city, and borne by the public generally, but may recover for any substantial injury caused by such noises, smells and disturbances, so far as they are not fairly incidental to the usual operation of a street railway and borne by the property owners generally along the line."

In Kentucky the constitution of 1891, sec. 242, provides: "Municipal and other corporations and individuals invested with the privilege of taking private property for public use shall make just compensation for property taken, injured or destroyed by them," etc.

The principle announced in these cases, we respectfully maintain, are reasonable and right, and are best adapted to the present conditions of the country. If every property holder along a line of railway has a right of action because a cinder from an engine gets in his eye or smoke or soot causes him some personal inconvenience, or the noises and vibrations produced by the running of the engines properly subjects him to some discomfort or inconvenience, then it follows that commerce will be manacled, the development of our cities and towns arrested, and the incentive to invest in those enterprises, which bring health and peace

and comfort to the greatest number will be removed, and the legitimate enterprises which build up, develop and sustain the prosperity of the state be seriously crippled, if not extinguished.

We are not discussing nor does the record show a case of nuisance. There is here, as we have shown, simply presented the question whether a quasi public corporation, burdened with heavy responsibilities and obligations under its contract with the city of Vicksburg, a material and controlling factor in the development of that city, located near hovels inhabited by negroes, and on a trunk line of railway, and in a place where the least harm can be done to many, bringing health and comfort to many thousand people of that city, conducting its business prudently, and without negligence, responding to every demand imposed upon it by its franchise, can be impeded in the execution of the terms of its franchises, its usefulness terminated and its property destroyed, because some of the parties owning property adjoining its power plant are inconvenienced and annoyed by the emission of smoke, steam, cinders, and the effect of vibration incident to the proper operation of said power plant.

We also respectfully submit that *Vicksburg* v. *Herman,* 72 Miss., 211 (s.c., 16 South. Rep., 434), does not necessarily conflict with the views that we have announced. Every case must be determined by its own facts, and the decision of the court considered with reference to those facts. In that case it appears that the grade of the streets had been raised in 1884, and in 1893, nine years thereafter and after improvements had been made on the property by Mr. Herman, the grade was changed so that the street was fifteen or eighteen feet lower in front of lots fifty-two and fifty-three, "thereby destroying entrance and exit to the residence." The right to recover in such a case seemed to be manifest.

Argued orally by *S. S. Hudson,* for appellant, and by *Joseph Hirsh,* for appellee.

CAMPBELL, Special J., delivered the opinion of the court.[*]

The appellant is the owner of a piece of land in Vicksburg, on the north side of Pine street, on which are five dwelling houses, one occupied by her and the others by tenants. The appellee owns and operates a plant on its land on the south side of that street for generating electrical power to furnish light for the city and its inhabitants and a street railway system, under a franchise granted by the city, with which it has a contract to furnish lights. Immediately south of the land of appellee are the tracks of the Alabama & Vicksburg Railway Company. The plant of the appellee consists of three engines and boilers and batteries, etc., and two smokestacks one hundred feet high. Its machinery is of the best kind, its employes skillful and careful, and its management above criticism. The appellant sued for depreciation in the value of her property, caused by noise, smoke, soot, cinders and vibration alleged to be caused by the plant of the appellee. She has a like suit against the Alabama & Vicksburg Railway Company. The evidence tends to show considerable depreciation in the value of the appellant's property, manifesting itself in reduced rents and inability to sell, except at a low price, because of the manner in which the property is affected by the causes complained of, arising from the plant of the appellee and the operations of the Alabama & Vicksburg Railway. The appellee denied that it damaged the property of the plaintiff, claimed that whatever depreciation of her property had occurred was before the appellee acquired its property, and that it is exempt from liability for any damage, because it is operating under public authority conferring the right to do what it does. The court instructed the jury to find for the defendant, refusing all instructions asked by the plaintiff.

The evidence shows that the property of the plaintiff was damaged by physical invasion of deleterious agents produced by the plant of the defendant and the Alabama & Vicksburg Railway,

---

[*] WHITFIELD, Chief Justice, being akin to a party interested in the suit, recused himself, and J. A. P. CAMPBELL, Esq., a member of the supreme court bar, was appointed and presided in his place.

and it should have been left to the jury to say from which and to what extent. Considered as if between two private owners of the two properties, without reference to the public franchise, the right of the plaintiff to recover damages to the extent that it may be shown that they proceed from a physical invasion of her property by hurtful agents proceeding from the plant of the defendant is clear. No owner of property may set in motion agencies which physically invade the home of another without liability for the damage done. Surely no citation of authority for this proposition can be necessary. An elaborate discussion of the subject is contained in a note under the first case in volume 1, L. R. A. (new series). Public authority may confer the right to operate a public work, and thus make it lawful, but cannot confer a right to take or damage private property without compensating the owner for its value as taken or damaged—that is, diminished in its market value as property—by some physical invasion of it or by affecting some right of the owner in relation to it. Were an act passed by the legislature for the exercise of the right of eminent domain declaring that no liability should arise for noise, smoke, soot, cinders, vibration, and the like, whatever their hurtful effect on the property of others might be, it would be void, because the elements or factors of damage to property depend upon facts, and are to be ascertained by evidence in judicial proceedings.

Constitution 1890, sec. 17, makes the right of the owner of private property superior to that of the public, reversing the former rule that the individual might be made to suffer loss for the public. He may still be compelled to part with his property for public use, but only on full payment for it or any right in relation to it. Before the constitution of 1890 it was held that a municipality might cut down a street to the injury of abutting owners, without any liability to them (*White* v. *Yazoo City,* 27 Miss., 357), and a river might be turned away from a plantation fronting on it without compensating the owner (*Homochitto River Com'rs* v. *Withers,* 29 Miss., 21 [64 Am. Dec., 126]), and

damage could be done to the property from constructing a levee
without any right of the owner to be indemnified (*Richardson
v. Board of Levee Com'rs,* 68 Miss., 539 [9 South. Rep., 351]).
This was because of the rule that the right of the public was
superior to that of the individual.    The decisions of this court
since the constitution of 1890 give full effect to the just rule
established by its seventeenth section, by maintaining the right
of the owner to be fully compensated for any loss of value sus-
tained from any physical injury to his property or disturbance
of any right in relation to it, whereby its market value is dimin-
ished.    *Railway Co.* v. *Bloom,* 71 Miss., 247 (15 South. Rep.,
72) ; *City of Vicksburg* v. *Herman,* 72 Miss., 211 (16 South.
Rep., 434) ; *Richardson* v. *Board of Levee Com'rs,* 77 Miss.,
518 (26 South. Rep., 963) ; *Rainey* v. *Hinds County,* 78 Miss.,
308 (28 South. Rep., 875) ; *City of Laurel* v. *Rowell,* 84 Miss.,
435 (36 South. Rep., 543).    Many decisions of the courts of
other states, with constitutions like ours, are cited and discussed
in Lewis' Eminent Domain, secs. 230–236.

It is worthy of observation that the instruction prescribed to
be given the jury in eminent domain proceedings is that "the
defendant is entitled to due compensation, not only for the value
of the property to be actually taken,  .  .  .   but also for dam-
ages, if any, which may result to him as a consequence of the
taking."    Code 1892, § 1690;  Code 1906, § 1865.    It is true
that the language of sec. 17 of the constitution was intended for
formal condemnation proceedings, wherein it provides for com-
pensation to be first made in a manner to be prescribed by law;
but it is equally protective of the owner of private property,
when no condemnation is had and his property is taken or dam-
aged by public use.    Due compensation is what ought to be made
—that is, what will make the owner whole pecuniarily for appro-
priating or injuring his property by any invasion of it cognizable
by the senses; or by interference with some right in relation to
property whereby its market value is lessened as the direct result
of the public use.

We recognize as true that when people live in cities, they, in the language of counsel, "surrender some of those privileges so dear to them when the air is rendered fragrant and healthful by the exhalations of the pine, musical with the gurgling currents of running water, and cooled by the unobstructed breezes from summer seas," but think they are entitled to enjoy their homes free from damaging results from invasion by smoke, soot, cinders, etc., sufficient to depreciate their value as property, in addition to rendering their occupancy uncomfortable.    This for the surrender of which counsel speaks.    We are unwilling to give license to destroy or annoy those engaged in any public employment useful to society, and favor protecting them in all their rights; but it is equally important to enforce the mandate of the constitution and protect the owner of private property, which is the purpose of this decision.

If the damage to the plaintiff's property was not caused by the plant of the defendant since it acquired it, but before, and there has been no continuing cause of damage, whereby depreciation of value has been maintained, there is no liability on it; but if damage was done during former ownership, and the cause is continued, whereby restoration of value has been prevented, the fact of the former damage would not avail the defendant.

We decline to pass on the instructions asked by the plaintiff and refused, assuming that in another trial instructions framed in conformity to this opinion will be given.    We would not be understood to intimate any opinion as to the effect of the evidence.    We merely hold that it should have been submitted to the jury, with proper instructions by the court.

*Reversed and remanded.*