McKIE SLAUGHTER v. MERIDIAN LIGHT & RAILWAY COMPANY.

[48 South. 6, Ib. 1040.]

1. STREETS. *Street railway construction. Abutting owner. Special damages. Constitution 1890, sec. 17. Injunction. Private property damaged by public use.*

   The construction of a street railway in a street so narrow that the operation of the railway practically excludes its use for other street purposes entitles an abutting owner to recover from the railway company the special damages sustained in consequence, whether a street railway be or be not an additional servitude, and he may enjoin the operation of the railway until the damages are paid, since private property may not be damaged for public use without compensation first made as provided. Constitution 1890, sec. 17.

2. EMINENT DOMAIN. *Constitution 1890, sec. 17. Acts amounting to damaging of private property.*

   Under Constitution 1890, sec. 17, providing that private property shall not be taken or damaged for public use, except on compensation being first made, there can be no change in a street, by raising or lowering the grade thereof, for ordinary purposes of street use and for greater convenience of the public in the use thereof, without liability to the abutting owner for the consequential damages. (Mayes, J., in first opinion, withdrawn on suggestion of error.)

3. SAME.  *Same.*  *Common law no aid.*

    The common law cannot be resorted to for ascertaining whether the operation of a street railway is a legitimate use of the street, or imposes an additional burden authorizing the abutting owner to recover therefor; but each state must form its own jurisprudence on the subject under its own Constitution and laws. (Mayes, J., in first opinion, withdrawn on suggestion of error.)

4. SAME.  *Same.*  *Street railway an additional servitude.*

    Under Constitution 1890, sec. 17, providing that private property shall not be taken or damaged for public use, except on compensation being first made, a street railway imposes an additional burden on the street, authorizing the abutting owner to additional damages therefor, whether the street is broad or narrow. (Mayes, J., in first opinion, withdrawn on suggestion of error.)

FROM the chancery court of Lauderdale county.

HON. JAMES L. McCASKILL, Chancellor.

Mrs. Slaughter, appellant, was complainant in the court below; the light and railway company, appellee, was defendant there. From a final decree in defendant's favor the complainant appealed to the supreme court. The facts are fully stated in the opinions of the court, the one vacated and the final one.

*G. Q. Hall, Hall & Jacobson,* for appellant.

Whether or not a street-car line operated by electricity imposes *per se* an additional burden on a street, or public highway is, we submit, a question of no importance and entirely immaterial since the adoption of that provision of the Constitution of 1890, sec. 17, inhibiting the taking or damaging of private property for public use without due compensation first made.

Prior to the use of the words "or damaged" the abutting property owner had no right of action in the absence of an actual "invasion of the property, a trespass upon it, and an appropriation of it to public use * * * merely consequential injuries resulting from the loss or impairment of some rights incident to the use or enjoyment, there being no invasion of the property itself, were not covered by the constitutional prohibition." *Vicksburg v. Herman,* 72 Miss. 214, 16 South. 434.

This court has repeatedly held that railroad companies are
liable for such incidental or consequential damage. *King v.
Vicksburg R. Co.,* 88 Miss. 456, 42 South. 377; *Alabama, etc.,
R. Co. v. Bloom,* 71 Miss. 247, 15 South. 72; *Helm v. Turner,*
89 Miss. 334, 42 South. 377. Also municipal corporations.
*Vicksburg v. Herman, supra, Meridian v. Higgins,* 81 Miss.
376, 33 South. 1. And so are counties: *Rainey v. Hinds
County,* 78 Miss. 308, 28 South. 875, *Warren County v. Rand,*
88 Miss. 395, 40 South. 481.

And such are the holdings of the courts of last resort in those
states having similiar constitutional or statutory provisions to
ours. *Sheely v. Kansas City, etc., R. Co,* 4 Am. St. Rep. 396;
*Campbell v. Railroad Co.,* 9 S. W. 1078.

Mr. Abbott in his excellent work on Municipal Corporations,
vol. 3, § 847, says:—

"The abutting owner, however, irrespective of his interest in
the adjoining highway, is entitled to compensation for the oc-
cupation of that highway by a surface street railway when
that use interferes with or destroys the easements which he
possesses as an abutting owner in the access to his property and
to light and air. These easements, as already stated, are prop-
erty rights and where an authorized use of a highway impairs
or destroys them, compensation can be recovered."

In 43 L. R. A. 554 *et seq.* is presented a collation of author-
ities holding street railroads of all kinds to be within the con-
stitutional inhibition as well as other entities both natural and
artificial. *Pittsburgh, etc., R. Co. v. McCutcheon,* 7 Atl. 146;
*Chicago R. Co. v. Huzels,* 42 N. W. 93; *McQuoid v. Portland,*
18 Or. 237; *Elizabethtown v. Combs,* 19 Am. Rep. 67; *Dooley
Block v. Salt Lake Rapid Transit,* 24 L. R. A. 610; *Cincinnati
St. Railway Co. v. Cumminsville,* 10 Ohio St. 523; *First Con-
gregational Church v. Milwaukee R.,* 77 Wis. 158; *Wichita
Railway Co. v. Smith,* 45 Kan. 264.

10 Am. & Eng. Ency. of Law, 1113, announces the rule as
follows:—"In those states where consequential damages are

provided by constitutional or statutory provisions compensation may be had for injuries to property although no part of the premises is taken."

Upon what predicate may street car companies be regarded as above the law, and as involving a status so unique that damages cannot be predicated of their acts in the absence of actual invasion of the premises of another? No good reason exists.

This court has not seen fit to engraft any such exception. On the contrary, speaking through Woods, J., it has held that the words "or damage" embrace within their inhibition all those attempting to convert private property to public use, artificial as well as natural persons, municipal and other like corporations alike; and they cover all damages of whatever character." . . .

"The citizen must be held, under this new provision of our fundamental law, to be entitled to due compensation for, not the taking, only, of his property for public use, but for all damages to his property that may result from works for public use. He is now secured in his property, and his use and enjoyment of his propetry. The burden formerly borne by the citizen, resulting from damage done his property by a diminution or destruction of his right to use and enjoy his own, were designed by this new constitutional rule to be placed upon those by whose action the diminution or destruction was wrought. *Vicksburg v. Herman,* 72 Miss. 215.

*Miller & Baskin,* for appellee.

The bill alleges that the construction of this car line and the use of it by the cars does not constitute an additional servitude of said street; but even if the bill did not so allege, the question is, does this street car constitute an additional servitude; if it does not, then the appellant has no right to recover damages. We do not know that this identical question has been passed upon by our supreme court, or that we can cite a case from our court on "all fours" with this contention. We do know that in

*Theobold v. L. N. O. & T. R. Co.,* 66 Miss. 279, our court has held that a steam railroad constitutes an additional servitude, and has sustained this by cogent reasoning and much authority; but we find this language in a note to said case:

"When the opinion in this case was announced Judge CAMP-BELL stated that as the railroad in this case connected distant points and merely passed through the city of Vicksburg, using the street for its track, he concurred in the result; but that in the case of a railroad within a city constructed and used as an ordinary street railway, possibly a different question would be raised, the question not involved by the facts of this case and therefore not decided."

In the case of *Hazlehurst v. Mayes,* 84 Miss. 11, we find that our court approved the holding that the establishment of a steam railroad upon a street is an additional servitude entitling the abutting owner, in front of whose property the railroad was constructed, to the right of recovering of damages. And the operation of the same rule has been applied to telegraph and telephone companies. Again in the case of *Gulf Coast Co. v. Bowers,* 80 Miss. 570, an electric light case, in which the court said that this was incidental to the proper use of the streets, and that therefore the abutting owner was held to have been fully compensated when the highway was originally acquired, making this electric light case different from telephone companies, telegraph companies and steam railroad companies, all of which were said to be often public conveniences, but were not incidental to the use of streets and highways, and the enjoyment and use of the streets as such was not increased by the equipment of steam railroads, telegraph and telephone companies. They form no part of the equipment of a public street, but are foreign to its use; and the doctrine is clearly announced in this case that the abutting owner is only entitled to damages when the street has been diverted from its original purpose and an additional servitude imposed thereon; for the reason that it could not be presumed that these steam railroads, telegraph and

telephone companies had acquired the right to use the street
when it is originally obtained. But the public use is the dom-
inant and controlling interest; the streets may be devoted to any
proper use incidental to the public thoroughfare and the
adjacent owner must suffer the resulting injury or incon-
venience, and, as a illustration, the authorities of a municipal-
ity may, when its charter powers permit, dig drains, lay gas
pipes or water mains, construct sewers or erect posts and wires
for lights, because such things are incidental uses within the
contemplated scope of the dedication of the highways to the
public use. "Briefly stated, a municipality may, without addi-
tional compensation to the abutting owner, place any equip-
ments or appliances in the streets which are necessary, con-
venient or incidental to the full use and enjoyment as such."
This is said to be based on the fundamental principle that the
rights of the adjacent owner are subordinate to the public in-
terests, and that as in that case the municipality had the right
to establish the electric light wires and posts, the citizen's right
to maintain trees upon the highways is subordinate and must
yield thereto, the complaint in this case being, as the court
knows, that the electric light company had injured or destroyed
the trees of the abutting owner. His rights in these trees were
subordinate to the right of the city to have one of those im-
provements which are incidental to urban life.

The question then is whether a street railway falls within
the category of an electric light company, and without the cate-
gory of a steam railroad or a telegraph or telephone company.
If it does not constitute an additional servitude, then it has the
right to occupy any of the streets or highways of the city, where
the city has the power to consent for it so to do. In the instant
case the bill alleges that the appellee had a franchise for con-
structing and operating an electric car line in said city, and
that in pursuance thereof lines of track had been constructed
and cars had been and are now being operated by the trolley sys-
tem along on the streets and avenues of said city, and that the

said appellee conceived the idea of extending its lines to and building upon and operating its cars along said Twelfth avenue, and that to that end it obtained from the municipal authorities permission so to do; so that there is no controversy about the power to grant this permission to the appellee by the municipal authorities, nor that the appellee was doing anything except such acts as it was authorized to do under its franchise rights.

The question as to whether a street railway is an additional servitude upon the streets of a city has undergone oft-repeated interpretations both by the text-writers and the decisions of the various courts, and we would be glad to have a declaration from our court on this question. In Keasby on Electric Wires (2d ed.), p. 145, we find where Judge Cooley in his work on Constitutional Limitations is quoted as saying:

"When land is dedicated for a street it is unquestionably appropriated for all the ordinary purposes of a street, not merely for the purposes for which such streets were formerly applied, but those demanded by new improvements and wants. Among these purposes is the use of heavy carriages which run upon a grooved track, and the appropriation of important streets in large cities for this use is not only a frequent necessity, which must be supposed to have been contemplated, but it is almost as much a matter of course as grading or paving."

Mr. Angell, Judge Dillon and Mr. Mills reach the same conclusion, citing Mills on Eminent Domain, § 205, and 2nd Dillon Municipal Corporations, § 722; Angell on Highways, § 91 E. Section 120 of Keasby draws the distinction between a steam railroad, which is not within the proper use of the streets, and gives the reasons for the distinction between that character of roads and the street railroads. And in the case of *Jersey City & Bergen R. Co. v. Jersey City,* cited on p. 148, and also in 20 N. J. Eq. 61, where the distinction is clearly drawn between the steam and street railroad, it is illustrated that the cars of the latter will stop in front of your door for the purpose of conveying persons from one point on its line to another, to

which they may desire to go, and the great use or advantage of it is to those whose property is taken for the street and whose lands adjoin it. This learned court says on page 149 that it was worthy of note that, before it was learned by experience that the use of steam railroads in the street was in fact excluded and was not consistent with the ordinary use of a street, it was held in New Jersey that this was only a new method of travel to which the streets might be devoted. The states of Maine, Minnesota and Arkansas, as shown on page 150, have also passed on this question; so we cite pp. 150-159, where authorities in great numbers from the various states are cited by said author, the consensus of opinion being that a street railroad is in no sense an additional servitude upon the streets. On pp. 158 and 159 of said book the author draws the same distinction between telegraph and telephone companies and steam railroads and a street railroad. Our court in the case of *Hazlehurst v. Mayes,* draws a distinction between these companies and an electric light company.

In the case of *Hobart v. Milwaukee City Railway Co. et al.,* 27 Wis. 194, it is declared by the court that the operation of a street railroad on a public street by the authority of the city government is not additional servitude or a new burden imposed upon the owners of the land; that they are not entitled to a compensation therefor, except where some right of the abutting owner is materially impaired. It is claimed in this *Hobart case* that the private right is injured, the right of free access to his premises which he had and would continue to have and enjoy except for the street railroad. The building upon the premises was a store used and occupied by the plaintiff as a wholesale merchant, and into and from which many heavy articles have to be constantly taken and received by wagons and drags, and which are loaded and unloaded in front of the store and on the street in question. The custom was to back the wagons or drays up to the curb stone or sidewalk and to discharge and receive freight to and from the store across the side-

walk. The laying of the rails and the running of the cars on that side of the middle of the street where the store is, though near the middle, would interfere with and prevent this custom. Sufficient space would not be left between the curb stone or sidewalk and the railroad track for the teams with wagons or drays to stand at right angles with, or crosswise of the street. The heads of the horses would come in contact with the passing cars. Such is the obstruction of which the plaintiff complains, or the private and peculiar injury for which he seeks redress. The court denies that he has such private right or easement in the street in front of his store; that the public authorities may permit such use of the street so long as they please, or until public convenience demands that it should cease; but that the plaintiff could not insist upon it as a right in himself. When the space thus occupied by his teams is required for public travel or the passage of vehicles of any kind authorized by the public, his occupation becomes an obstruction and a nuisance, and he must make room for these public vehicles. The injunction in the case as therefore denied to the said plaintiff.

The supreme court of Pennsylvania has also considered the question as to the rights of a street railway upon the streets in the case of *Rafferty v. Central Traction Co.,* 147 Pa. 579. This state is one which has the damage clause in its constitution similiar to sec. 17 of our Constitution. This was a case where an injunction was issued to prevent the laying of rails on a street in such proximity to the curbing as to interfere with the ingress and egress of the abutting property holders, and the rights of such property holders were exhausively discussed by the court. It is claimed by the plaintiffs in this case that their right of free access to their property along the street was interfered with because vehicles could not stand between the tracks and the curb stone without interfering with the cars. It was held that the right of a property owner in this respect was not at all changed by the construction of the car track and the use of the same for the street car. He has the same right after tracks are laid that

he had before; it is a right which must be exercised with reason whether there are car tracks on the street or not; in no circumstance does it confer the privilege of obstruction by the unreasonable exercise; but the reasonable exercise of the right gives no right to the street car to arrest it. The court held that the operation of a street railroad by electricity was not an additional servitude or burden upon the land, which would entitle the owner of property abutting on the street to compensation for damages, or to an injunction against the construction and maintenance of such a track. If at any time the owner has occasion for the presence of vehicles in front of his property in the street to take away or deliver persons or goods, he may exercise that right for such reasonable time as is necessary for his purpose; and if, in the exercise of such right, the passage of street cars is impeded, the cars must wait. See also case of *Williams v. City Electric Street R. Co.*, 41 Fed. 556, where it is held that it is not an additional servitude or burden upon the land already dedicated or condemned to the use of a public street.

In the case of *Briggs & Lewiston v. A Horse Ry. Co.*, 79 Me. 363, the court declared that the construction and operation of a street railroad in a street is for the accommodation of persons desiring to travel in the street and is a later mode of using the street as a highway for the very purpose for which it was originally taken. In the case of *Detroit City R. Co. v. Miller*, 85 Mich. 634, the court held that street railroads, when constructed so as not to interfere with the rights of others upon the streets, from no obstruction to such use and enjoyment; they make no more noise than the omnibus and other heavy vehicles, are not more dangerous, and no more interfere with access to the abutting lots; they constitute a modern and improved use only of a street as a public highway. It was held that the abutting property owner would not be entitled to compensation for such use in the absence of a statute giving it, or plain proof of such injury. We have no such statute.

In *Louisville Bagging Mfg. Co. v. Central Pass R. Co.,* 95 Ky. 50, which is also one of the states which have a Constitution like Mississippi, it was said to be well settled that the use of a public street by means of railway cars falls within the purposes for which streets are established and dedicated. The trolley system of oprating street cars is no more dangerous than horse power; that said street railroad cars go at a greater speed, are more comfortable; that they are cheaper, much more easily controlled than horse cars, and do not really more obstruct the streets or interfere unreasonably with business transacted thereon. *Morris et al. v. Montgomery Traction Co.,* decided the supreme court of Alabama, and found in 38 South. 834, declares that a street surface passenger railroad constructed at grade in the usual manner, operated by animal or electric power, does not constitute a substantial impairment of the private property rights of abutting owners so long as its use of the street does not unnecessarily interfere with the ordinary modes of travel, though the street in which the tracks were laid was so narrow as to render it difficult for the passage of street cars and vehicles. Streets and highways are dedicated to the use of the traveling public, and street railroads which are for the purpose of faciliating travel impose no additional burden upon the abutting owner, and are a public use. If they create immense volumes of dust and vibrations, and are attended with some inconvenience and even danger to life and property, so do other vehicles of travel and trade. They are legitimate uses within the original dedication of streets for the benefit of the public. (Citing Joyce on Electric Law, §§ 278-341; also Booth on Street Railroads; Nellis on Surface Railroads; and other Alabama cases.) The court will bear in mind that this is one of the states which have a constitution similar to ours. See also *Baker v. Selma Street & Suburban R. Co.,* 33 South. 685, and authorities there cited; *Lockhart v. Craig St. R. Co.,* 139 Pa. St. 419; *Taggart v. Newport St. R. Co.,* 16 R. I. 668.

It is also held that a street railroad operated by electricity

imposes no new servitude upon the property owner, although poles and wires were erected in the street in connection with the railroad; laying a street car track so close to the sidewalk that vehicles can not stand gives no ground for action.

The case of *La Crosse City R. Co. v. Highbee,* 51 L. R. A. 923, is an exhaustive opinion upon the subject matter involved in this controversy, declaring the want of right of the abutting owner to recover because of the operation of a street railroad. In this case the court will find decisions referred to from nearly every state in the Union upon the questions discussed in this case. The learned judge in this case shows that there are only two states in the Union which undertake to hold that a street railroad is an additional servitude upon the street, thereby entitling the abutting owner to damages; these are the states of New York and Nebraska, and that the New York judges are equally divided upon the question, and that the Nebraska case was not sustained in its conclusion by the citations to which it refers. Cases are cited from Illinois, which state is the mother of the constitutioal phrase that property "can not be damaged" without making compensation. This *Higbee case* draws the distinction between telegraph and telephone companies, and street railroads, and concurs with and approves of the intimation of the supreme court of Mississippi as indicated by the note of Judge CAMPBELL in 66 Miss. 279, and the views of our court as shown in *Gulf Coast Co. v. Bowers,* 80 Miss. 570, 32 South. 113, and the case of *Hazlehurst v. Mayes,* 84 Miss. 11, which quotes lavishly from the best known authorities, such as Booth on Street Railroads, Joyce on Electric Law, and other authors who have written upon this subject. It declares that street railroads are but an improved method of using the streets for public travel, which was the original purpose to which they were devoted, as were the horse railroads in their day: the same principle that justifies one without purchasing the right from an abutting owner justifies the other. In fact it declares that no private right is substantially impaired; and that an electric

car as compared with a horse car in regard to the freedom from interfering with private rights is superior in relieving the street, because it moves more rapidly, is started and stopped with greater facility, and will readily move a greater number of persons a greater distance in a given time; it is superior as regards actually obstructing the street, because of its more rapid motion and shorter stops. Because of these considerations courts have declared the law to be that it is not an impairment of the abutting owner's property rights and not a burden upon the street, but is in accord with the original purpose of the use of the streets for which they were dedicated.

Referring now to the authorities of the learned counsel for appellant we submit to the court that the Mississippi decisions cited by counsel do not apply in the instant case, because, as stated above, there is no proof to show that the appellant suffered damages because of any excavations or grading in the street in front of her property, nor was her property in anywise submerged by water on account of the act of the appellee; but that the sole ground upon which the damages are claimed, as stated above, grow out of construction and running of a street railroad in front of appellant's property. The case of *James v. Omaha R. Co.,* 36 L. R. A. 751, is referred to, and we submit that it is fully overthrown by the case and numerous citations of *La Crosse City R. Co. v. Higbee,* 51 L. R. A. 923. The case of *Sheehy v. Kansas City Cable R. Co.,* cited by appellant's counsel, is a suit for damages caused by altering the grade of a street by the railway company, by which the abutting owner claims to have suffered.

The quotation from Mr. Abbott on Municipal Corporation, vol. 3, § 847, from which counsel quotes and upon which he seems to rely, refers to note 745, where the authorities when examined will be found to sustain the contention of appellee. By reference to sec. 844 of said book the court will see that the author says that the preceding section holding that the use of a highway by a commercial steam road imposes an additional

burden upon it, for which the abutting property owner is entitled to compensation, have led the courts to the holding by an equally and as great a weight of authority that, in the absence of a statute to the contrary, the use of a highway by a street railroad does not impose an additional burden or servitude upon it as a legitimate use of the street, one which was intended or anticipated by the original owner and for which, therefore, he is not entitled to compensation. And the note which is referred to shows a collation of authorities from nearly every state in the Union and covering two pages of said book. He sums up in § 850 as follows:

"A general rule, so far as can be stated, in respect to the use of a highway by a railroad, which is a question of law, would, apparently, therefore, from the adopted cases, be as follows: A legitimate use of a highway includes one by a railroad devoted exclusively to street passenger travel and the track of which conforms to the surface of the street. The rule would exclude, therefore, a commercial steam road because of the character of its traffic."

The case cited by adverse counsel in 43 L. R. A. 554 et seq. is a Kentucky case, in which state a similar constitutional provision to ours is found, holding that a street railroad is not an additional servitude upon the streets and that the abutting owner has no right to damages. The case referred to in 7 Atl. is an elevated railroad case. The case of *Elizabethtown R. Co. v. Combs,* 19 Am. Rep. 67, is a steam railroad case. The case in 24 L. R. A. 610, is a case where the authorities of Salt Lake City had granted the right to a railroad company to occupy a street, and also upon the same street allowed telephone and telegraph poles and wires to be erected, and authorized a second railroad which was not at all necessary to occupy said street; so that by all these different corporations with their different poles and wires, the means of ingress and egress to the property of the several abutting owners were practically closed. The court declared in this case that the ordinance in thus filling up this

one street was an unreasonable ordinance. We have not the opportunity to examine the Northwestern, Ohio and Wisconsin Reports, as they are not accessible.

The case of *Campbell v. Metropolitan Street R. Co.* is referred to by learned counsel for appellant. As we understand the facts to be in this case, the allegation by an abutting owner against the street railroad company was, that the west rail of the track of the railroad was laid within thirteen inches of the curb stone on the abutting owner's side of the street in front of his lot, and that the cars ran daily from 6 o'clock a. m. to 10 o'clock p. m. passing the premises every five minutes and often as many as four, five and six cars following in trains immediately one after the other, thus effectually cutting off all safe entrance to and exits from said property by any kind of vehicle. This, it seems, under that sort of an allegation was a good pleading and would withstand a demurrer. The case referred to in 18 Oreg. involved a willful act on the part of the railroad company. And another fact in the *Campbell v. Metropolitan Street R. Co. case,* where damages were claimed because of the close proximity of the track to the premises of the owner, is that the street was on an upgrade, and horses and mules drawing the cars were often driven under the lash, causing them to rear, plunge, pitch and jump on the sidewalk in front of plaintiff's property, greatly to the annoyance of himself and family. But the court held that this was demurrable "as alleging a nuisance to the occupancy, and that the right to recover damages must be for damages to the property, and must consist neither of inconvenience nor nuisance."

The case of *Victor Montgomery v. Santa Anna & W. R. Co.,* 25 L. R. A., is one of the csaes referred to in sec. 847, Abbott on Municipal Corporations, cited by learned counsel for appellant: this refers to various authorities found in counsel's brief following his quotation from Abbott on p. 8 of said brief; and we respectfully submit that this authority does not sustain the contention of counsel, and we would be glad if the court would

read said case. Another one of the authorities cited in the notes to sec. 847 of Abbott is the case of *New Jersey v. Mayor of Jersey City,* 26 L. R. A. 281, by reference to which the court will see that the court in that case does not sustain the contention of counsel.

Summing up we respectfully submit that the allegations of the bill as to damages from excavations or grading of the avenue were not sustained by the complainant in her testimony, but that the testimony of the appellee overturned entirely the allegations, and the chancellor decided this issue properly for the defendant.

Second, that the allegation that the appellant's mother did not consent to the use of Twelfth avenue by the appellee is not sustained by the testimony; the testimony showing that the appellant's mother not only consented, but declared that she would give $100 to have the appellee traverse Twelfth avenue with its street cars; and the further evidence showing that this was her desire is shown by the undisputed testimony of I. F. Ethridge, who stated that she had purchased or bargained for the property of his sister situated on said avenue and occupying the same position with reference to the street railroad as the appellant's property does, and that this bargain was made because of the fact that the street railroad would occupy said avenue. The trade was not consummated because of the death of appellant's mother.

Third, that the allegation in the bill that the street car could not be passed by other vehicles because of the narrowness of the street was not sustained by the testimony.

Fourth, there is no testimony that the appellee ever excavated or graded the street or sidewalk abutting the appellant's property; that if she suffered any damage on account of this, the city of Meridian is exclusively liable; but we deny that the allegation that she suffeerd any damage whatever.has been established either on account of the city or any of its employes.

Fifth, The allegation that the appellant suffered damages be-

cause of the occupancy by the appellee of the street is under the testimony not sustained, because appellant in undertaking to establish that her property was damaged was met by a preponderance of the testimony showing that it was not damaged.

Sixth, because we believe that the question as to the occupancy by the appellee of this avenue with its street railroad is a question of law, and under the law it was not an additional servitude upon the street, and not being an additional servitude she, as an abutting owner, is not entitled to any damages.

MAYES, J., delivered the first opinion of the court, the one afterwards withdrawn.

During the year 1906 the Meridian Light & Railway Company obtained from the municipal authorities of the city of Meridian the right to construct and operate a street railway line on certain streets in the city of Meridian, one of the streets being Twelfth avenue. This avenue is only forty feet wide from property line to property line. The sidewalk on one side is eight feet wide, and the sidewalk on the other side is nine feet wide, leaving a space for the street proper of twenty-three feet, down the center of which the railway company has placed its line. When a car is in operation it occupies a space of eight feet in the center of the street, leaving a space of six feet and two inches between the outer edge of the car and the curb. The standard-guage wagon is about six feet from outer edge to outer edge of hub, according to the testimony, leaving only about two inches of space between the car and wagon when passing on the street. It is true that it is shown by the testimony that the city ordinances permit only an eight foot sidewalk on avenues of this character and width; but this cannot alter the principle in this case. Mrs. Slaughter owns an entire block abutting this street, except about seventy-two feet owned by another party; Mrs. Slaughter's frontage being about two hundred seventeen feet on this avenue. On the 12th day of July, 1906, Mrs. Slaughter filed a bill in the chancery court seeking to restrain the railway

company from operating its road on Twelfth avenue until they had compensated her for the damage done her property by the operation of the street railway, and, further, for damage claimed because of certain excavations made by the company in placing their line on the avenue.

The property in question had formerly belonged to the mother of Mrs. Slaughter; but, the mother having been killed by a cyclone some time in March, 1906, Mrs. Slaughter had inherited the property and was sole owner. The record shows that there were various protests entered against the placing of this railway on the avenue by the different owners of the property before the track was placed in the street, so that no question of waiver or estoppel is presented in any way. The narrowness of the street makes it difficult and almost impossible for a vehicle to be in the street at the same time with the car, and the street is rendered much less available for ordinary traffic since the occupation of the street by the railroad company. Of this there can be no doubt. The testimony fails to show that Mrs. Slaughter was damaged by any excavations made by the railroad company, and the chancellor so found as a fact, and we think correctly. If Mrs. Slaughter is damaged by any excavations, such excavations as produced the damage were made by the city, and not the railway company. But the testimony shows that by the maintenance and operation of this railway the property of Mrs. Slaughter is depreciated in value in a sum variously estimated at from $500 to $1,250. On the hearing the chancellor adjudged that Mrs. Slaughter was not entitled to recover, and dismissed the bill, from which judgment an appeal is prosecuted to this court.

The sole question presented by this record is whether or not a street railway and its maintenance and operation may be said to be one of the legitimate uses of a street, in contemplation of the parties at the time of the original taking, so as not to impose an additional burden on the street when afterwards placed there, and precluding abutting property owners from claiming addi-

tional damage? If such has been the rule heretofore, does not sec. 17 of the Constitution of 1890 change the rule? The question in this case is presented to this court for decision for the first time. We have before us the holding of all the courts on this subject, and in addition to this we also have what many of the courts did not have at the date they were called on to decide this question; that is, we have a fully developed system of street railways, and the relation of the street railway to the public and its effect on the value of property adjacent to it can now be seen in all its aspects. It is undoubtedly true that the great weight of earlier authority is in favor of the holding that the abutting property owner is not entitled to additional compensation when the street is subjected to street railway uses after the original taking, and that such a use does not impose an additional servitude on a street; but it is not to be forgotten that many of the decisions so holding were made at a time when street railways were not in common use, and under Constitutions that provided compensation only for the taking of property, and not for consequential damage, as does our Constitution.

In order to properly understand this question, it will be necessary to review to a limited extent the history of street railways and the decisions bearing upon this subject. The first street railway of which we have any history was constructed by one John Stephenson in 1831 in the city of New York. This venture proved a failure from a commercial standpoint, and in a short while was abandoned. The enterprise was again resumed in 1845, and from this date it may be said that this system of street traffic became firmly established. The first street railway was operated in Boston in 1856, in Philadelphia in 1857, and in New Orleans in 1861. The first electric street railway was constructed in Cleveland, Ohio, in 1884. It is thus seen that the street railway as now in use in nearly all the cities is a thing of modern origin. The common law cannot be resorted to, to ascertain whether or not such uses of the street can be said to have been within the contemplation of the parties at the time of the

taking, because there is no common law on the subject.   Each
state must form its own jurisprudence on this subject, and the
question must be determined under its own Constitution and
laws.

It was a known fact that under the Constitution of 1869, pro-
viding for compensation to the owner of property for public use,
the property owner often suffered damage as a consequence of
the taking for which there could be no recovery.   When the con-
·stitutional convention met in 1890 a more liberal and just rule
·was established, in that by sec. 17 it was provided that the prop-
erty owner should be compensated for both the taking and for
damaging.   Under this section of the Constitution individual
rights are guarded completely, and it is now impossible for an
individual to suffer damage to his property rights through public
uses without full compensation.   No narrow construction should
ever be given to this clause of the Constitution, adopted, as it
was, to more fully secure individual right.

The first construction of this section of the Constitution was
in the case of *Vicksburg v. Herman,* 72 Miss. 211, 16 South.
434.   Herman owned certain lots in the city of Vicksburg front-
ing on Belmont and Monroe streets.   These streets had originally
been dedicated to public use and a grade established thereon.
Subsequently a new grade was established by the city; and in so
doing the property of Herman was damaged as a consequence.
The streets in question had originally been used by the public,
and the change in grade was merely for the purpose of improv-
ing the street and making it more available for public uses.   The
·court, speaking through Judge WOODS, said: "Under our former
Constitutions, which provided only for due compensation to the
·owner for taking private property for public use, it had been
long held that, to entitle the private owner to compensation for
the taking of his property for public use, there must be an in-
vasion of the property, a trespass upon it, and an appropriation
·of it to public use.   There must have been, formerly, that which
.amounted to a deprivation of the owner of his property; and

merely consequential injuries, resulting from the loss or impairment of some rights incident to the use or enjoyment, there being
no invasion of the property itself, were not covered by the constitutional prohibition.   Such was the law as understood and
applied before the incorporation of the new words we have referred to.   The words are without limitation or qualification.
They embrace within their inhibition all those attempting to
convert private property to public use, artificial as well as natural persons, municipal and other corporations alike; and they
cover all damages of whatever character.   *   *   *   The citizen must now be held, under this new provision of our fundamental law, to be entitled to due compensation for, not the
taking only of his property for public use, but for all damages
to his property that may result from works for public use.   He
is now secured in his property, and his use and enjoyment of his
property.   The burdens formerly borne by the citizen, resulting
from damage done his property by a diminution or destruction
of his right to use and enjoy his own, were designed by this new
constitutional rule to be placed upon those by whose action the
diminution or destruction was wrought."

In the case of *Warren County v. Rand,* 88 Miss. 395, 40
South. 481, where the suit was by Rand for damage done his
property as a mere consequence of a change of grade in the highway already dedicated to public use, the court held the county
liable for the consequential injury.   To the same effect was the
case of *Williams v. City of Jackson* (Miss.) 46 South. 551.   In
the case of *King v. Railway Co.,* 88 Miss. 456, 42 South. 204,
6 L. R. A. (N. S.) 1036, 117 Am. St. Rep. 749; CAMPBELL,
Special Judge, delivering the opinion of the court said that:
"Const. 1890, § 17, makes the right of the owner of private
property superior to that of the public, reversing the former rule
that the individual might be made to suffer loss for the public.
He may still be compelled to part with his property for public
use, but only on full payment for it, or any right in relation to
it.   Before the Constitution of 1890 it was held that a muni-

cipality might cut down a street to the injury of abutting owners without any liability to them (*White v. Yazoo City,* 27 Miss. 357), and a river might be turned away from a plantation fronting on it without compensating the owner (*Homochitto River Com'rs v. Withers,* 29 Miss. 21, 64 Am. Dec. 126), and damage could be done to the property from constructing a levee without any right of the owner to be indemnified (*Richardson v. Board of Levee Com'rs,* 68 Miss. 539, 9 South. 351). This was because of the rule that the right of the public was superior to that of the individual. The decisions of this court since the Constitu-. tion of 1890 give full effect to the just rule established by its seventeenth section, by maintaining the right of the owner to be fully compensated for any loss of value sustained from any physical injury to his property or disturbance of any right in relation to it, whereby its market value is diminished."

The object in citing these cases is to show that under this section of the Constitution our court has held that although there has been a prior taking of private property for street uses, and the change made in the street or highway is only for the purpose of making the use of the street as such more efficient and for the greater convenience of the public, and for only the ordinary purposes, yet any new thing done to the street, producing damage to the abutter as a consequence, entitles him to additional compensation, thus giving a broad construction to the Constitution and precluding the idea of damage without responsibility therefor. This holding of the court is in the face of many authors treating the subject of eminent domain. Thus, in Lewis on Eminent Domain, § 92, it is held that there can be no recovery for a mere change in the grade of a street or highway. To the same effect is 2 Abbott on Municipal Corporations, § 810, and almost all authorities writing on this subject. We cite these authorities to show that our own court is not in line with this holding, but under sec. 17 of the Constitution has adopted a different rule.

Having shown by our authorities that there can be no change

in a street or highway, even where that change is for ordinary purposes of street use and for greater convenience of the public in its use, by raising or lowering the grade thereof, without liability to the abutting owner for consequential damage, the next question we have to consider is: Where there has been no change in the grade in any way, but the street is merely permitted to be used by a street railway, does such use impose an additional burden on the street in such way as to entitle an abutting owner to additional compensation? Can such use of the street be said to be a legitimate use, and in contemplation of the parties at the time of the original taking? At most, the building of a street car line on any street is but a remote possibility, depending upon many things which may never happen, and such a remote responsibility that a landowner could hardly ask that a sum additional to the actual value of the land should be allowed him at the time of the taking. That hacks, wagons, buggies, foot passengers, and all such will make use of the street is a certainty; hence these things, in the very nature of it, are contemplated uses of the street. But the remote possibility that any individual or corporation will at any time deem it financially advisable to construct and operate a street railway on the street is the merest possibility, too remote to be considered as an element of damage when the property is taken. On this subject we will first consider what our own court has had to say.

In the case of *Stowers v. Telegraph Company*, 68 Miss. 559, 9 South. 356, 12 L. R. A. 864, 24 Am. St. Rep. 290, it was held that a municipal corporation could not authorize a telegraph company to construct its line along a public street without making compensation to the owner, holding that it was an additional servitude. In this case, and in the case of *Theobold v. L. N. O. & T. Ry.*, 66 Miss. 279, 6 South. 230, 4 L. R. A. 735, 14 Am. St. Rep. 564, it was also held that this was true, regardless of whether or not the fee was in the public or the abutting owner. In this case of *Telephone Co. v. Cassedy*, 78 Miss. 666, 29 South. 762, the same was held in regard to telephone companies. If it

be held that the operation of a telephone company in a street is an additional burden, it is difficult to see on what principle a street railway can escape. The construction of the telephone line is much the same as that of the modern street railway operated by electricity. The operation of the telephone is less dangerous to the public. It affords fewer obstacles to the use of the street by others. It is a matter of just as much or more public convenience. It takes from the street many messengers, and to that extent, at least, relieves the congestion of traffic. It uses no special track in the street, excluding therefrom all others while moving on same. In short, the interruption to the ordinary use of the street by others is far less interferred with by the telephone than the street railway. In the case of *Theobold v. L. N. O. & T. Ry.,* 66 Miss. 279, 6 South. 230, 4 L. R. A. 735, 14 Am. St. Rep. 564, this court held that a steam railway was an additional burden on the street, entitling the abutter to additional compensation. In delivering the opinion of the court Judge ARNOLD said: "A street is a public thoroughfare or highway, established for the accomodation of the public generally, in passing from place to place, and for such other incidental uses as are ordinarily made of public streets, such as laying drains, sewers, gas and water pipes, and the like. Public streets are for the use and benefit of all, and no one has any exclusive rights and privileges therein. They are free to all upon like conditions, and subject to use by any means of locomotion which is not destructive of the common uses and ordinary methods of travel. * * * If the street is needed for the purposes of a railroad, or for any other purpose inconsistent with the ordinary uses of a public street, the rights and interests of the abutting owner must be obtained, with his consent, or by the exercise of the right of eminent domain, as in other cases of taking private property for public use. * * * It is apparent that there is difference between the ordinary horse railway and the ordinary steam railway, with reference to their use of a public street; but whether the difference is only one of degree we are not called upon to decide in this case."

The decision above quoted was rendered under the Constitution of 1869, and the court intimated very strongly that there was only a difference in degree between steam and street railways, and no difference in principle.    But it is said that this court held, in the case of *Rosenbaum v. Meridian Light & Railway Co.,* 38 South. 321, that the operation of a street railway did not impose an additional burden on the street.    We do·not so interpret the decision.    That case was decided purely on a question of fact, not involving the principle here contended for. Ths was expressly stated in the opinion.    The case of *Hazlehurst v. Mayes,* 84 Miss. 7, 36 South. 33, 64 L. R. A. 805, has no ap-.plication to this case.    The *Mayes case* simply held that where the city owned its own electric plant, constructed and operated for the purpose of furnishing light to the municipality, the use of the streets for the purpose of maintaining and operating this · plant was one of the ordinary uses in contemplation of the parties at the time of the original taking.    The case of *Gulf Coast Co. v. Bowers,* 80 Miss. 570, 32 South. 113, merely held that, as the city had the right to light the streets, it could make a contract with another to furnish the lights, and license the use of the streets for that purpose, without rendering that other party liable to abutting property owners.    But there is a great difference between a plant owned and operated by the town for the purpose of lighting same and a street railway owned and operated by an individual or corporation appropriating certain portions of the street to its exclusive use while in operation and conducting the enterprise for purely personal profit.    In all ages streets have been lighted.    Such usage is necessary in order to make them safe and complete their use to the public.    It may well be said the necessity for lighting streets is a matter of such common knowledge that it must have been within the contemplation of the parties at the time of the taking.    None of this can be said of the remote possibility of a car line being established on the street.    It is recognized by Cooley and others that, when property is condemned for railway purposes proper, greater damage is allowable than when the property is merely to be used

for ordinary street purposes. This being the case, and the obstruction afforded to ordinary uses of the street by a street railway, varying from that of the steam road only in degree, the conclusion seems irresistible that any car line using a fixed right of way on a street, obtaining a use of the street impossible to be shared in common with others, excluding others from the use of the way occupied by it while in operation, imposes an additional burden on the street.

All holdings contrary to this came about through a wrong view of the real classification of the street car. It has been classified with hacks, carriages, wagons, buggies, drays, etc., usually occupying streets. The public use which they subserved and the public necessity for their operation has led to this confusion, and the rights of private individuals have been lost sight of. While a street car is a public utility, it is not to be forgotten that it is operated purely for private gain in most instances; few street railways would be maintained for the public good alone, if private gain was not the controlling consideration. They are not like other vehicles on the street. They have fixed lines over which to run, and when so doing they can turn neither to the right nor to the left. All other transportation in or use of the street must yield to the street car. Its track is appropriated exclusively while in operation, and is not subject to a common use. It must obtain a special franchise before it can occupy a street or highway. That is not the case with any other vehicle using the street. It is readily seen, therefore, that it affords greater obstruction to the common use of the street than any other vehicle. Its exclusive uses of the street and its impediment to a common use of same is well known. Unless the street is very broad, property is more valuable and brings higher prices on the market near to, but not fronting on, a street railway line. All this shows that a street railway is looked upon as a damage to property fronting thereon, varying in degree according to its proximity. No other traffic in the street produces this effect on property; hence the street railway cannot be regarded as the

same as, or classified with, the use of the street by other ordinary vehicles. In broad streets the damage may be slight. In narrow streets it is greater, but the principle is not different.

In Cooley on Constitutional Limitations (7th Ed.) p. 802, it is stated in the text that a street railway is a legitimate use of the street. As authority for this text, dropping into the common error, several earlier cases are cited, decided at a time when street railways were not common, and little understood. We differ from this learned author with much reluctance, but the text was written in 1868, when few cities had any street railway system, and when the decisions upon this subject were meager. But this same authority holds on page 795 that, if the street be a narrow street, the abutter would be entitled to additional compensation. It is difficult for us to understand how it can be held that the use of the street for railway purposes is a legitimate use, one of the ordinary purposes for which it was intended at the time of the taking, and for which the owner has been fully compensated, and yet hold that, because it happens to be a narrow street, the owner having already been fully compensated for all legitimate uses, he can recover additional damages because the street is narrow. It does not seem to us that such reasoning is sound.

In Lewis on Eminent Domain, vol. 1, p. 268, the author says a "review of cases shows how conflicting and irreconcilable are the authorities. The weight of authority is that a street passenger railroad, laid on the surface or established grade of a street, is a legitimate street use, while all other railroads are not. But what rational basis is there for a distinction between freight and passenger traffic? . . . To say that one railroad is a legitimate street use because it carries only passengers, and that another is not a legitimate use because it carries both freight and passengers, is purely arbitrary. It is a distinction which cannot be founded upon the nature and uses of streets. . . . It seems to the writer that there is no rational basis for a distinction between surface roads, and that either all should be admit-

ted as legitimate, or all excluded as illegitimate, street uses. As between these alternatives the latter should be chosen. A railroad involves a fixed and permanent structure in the street, which is more or less of an obstruction to ordinary travel. If one track is a legitimate use, there seems to be no escape from the consequence that any number of tracks is legitimate. It rests simply with the proper public authorities to determine how many tracks will best subserve the public interests; and so a street might be filled with railroad tracks, and all ordinary traffic excluded therefrom, and yet be held to be devoted to legitimate and proper street uses, and this is a palpable absurdity. For these reasons we think that railroads are not legitimate street uses. This conclusion does not prevent the use of streets by railroads, since property devoted to one public use may be taken for another public use, or a joint use permitted. It simply prevents such use being made without just compensation to abutting property owners." Again, the same author says, on page 282 (§ 117*a*) : "Some of the states which hold that railroads of all kinds are legitimate street uses have sought to avoid the harsh consequences of this doctrine by introducing the qualification that for any unreasonable or excessive use of the street the abutter may have compensation." The same author says, on page 286 : "These cases, as it seems to the writer, are a virtual confession of error in holding railroads to be a legitimate street use. They illustrate, however, the tendency of courts to work out in one way or another substantial justice to the property owner."

In Keasby on Electric Wires, p. 177, after a review of all the authorities, showing that a large majority of the cases hold that a street railway imposes no additional servitude on the street, the author says : "It is no doubt true that all railroads do affect in some degree the use of a street. They do claim some exclusive use. They divide the street into two parts, and, if it narrow, they make it impossible to leave a wagon standing at the curbstone. The electric road may have some additional elements of danger and obstruction, and it may well be that the solution

of the difficulty is to be found in the suggestion that a person who suffers actual damage shall be entitled to compensation for the injury he sustains."

The authorities are unanimous to the effect that the motive power used is not determinative. The principle is the same in its application, whether the motive power be electricity, cable, or horse power. Mr. Elliott in his work on Roads and Streets (§ 700), makes the question of additional servitude depend upon the width of the street, a reasoning which we have heretofore seen is not to be sustained. From the authorities already cited it will be seen that the courts and the law writers have been dissatisfied with the holding that street railways imposed no additional servitude. It has been their endeavor to get away from this line of authority, realizing the error of it. While the authorities are unanimous on the proposition that steam railways impose additional servitude, it has not always been so held. In the case of *Morris & Essex Railway Company v. City of Newark,* 10 N. J. Eq. 352, decided in 1855, before experience and mature thought had taught better, it was held that a steam railway might lawfully occupy a street without imposing any additional burden thereon. The same thing was held in the early history of railroads by other states. All such decisions have long since been departed from and are now looked upon as mere curiosities in the law. It is worthy of note that, in order to obviate the rule laid down by many courts that no additional servitude is imposed by the use of the street for street railway purposes, many states have passed statutes making them liable. See note in 2 Am. & Eng. Annotated Cases, p. 537.

In the case of *Detroit Railway Co. v. Mills,* 85 Mich. 634, 48 N. W. 1007, the court consisted of five judges, three of whom held that an additional servitude was imposed upon a street by its use for street railway purposes, and in this case McGRATH, J., says:

"The case hinges upon the question as to whether or not the construction and operation of a street railway in a street, and, as

incident thereto, the placing of poles therein upon which are to be stretched electric wires, is a new servitude; and I am clearly of the opinion that a street railway, whether operated by animal power, electricity, or steam, is an additional burden; and it seems to me that the exemption of any street, whether narrow or not, is a practical concession to this view. If it is or can be an added servitude in any street, however narrow, it must be in any street, however wide; the only difference being one of degree. If the width of the street is to determine, just what width shall determine the question? If the right exists to grant a franchise in one street and the exercise of that right concludes the abutting owner, why not in any street? Any fixed right of way in a street is a burden upon that street. Any use of a street, a like use of which is not common to all, is a new servitude. Any use of a street which narrows the street, or which interferes with the use of any part of the street by the public, or confines the public to a use of but a part of the street, is an added burden. Any use of a street which increases the danger of a common use of that street is an additional servitude. Any use of a street which interferes with its use by the public is a use affecting the abutting owners. The value of property upon a street is materially affected by its width, by the portion thereof devoted to public travel, by the facilities afforded for ingress and egress, and by anything and everything that interferes with a common use of the street or the abutting owner's access to it, or which obstructs his view or interferes with the utility or beauty of his premises. He is entitled to every use which is not inconsistent with the public use, and to every use which is not inconsistent with such a use as is common to all. A street railway lays its track upon the surface and in the center of a street. It appropriates just so much of the street to its use, and to a use which is practically exclusive. It divides a wide street into two narrow streets. The portion of the street occupied by its tracks can only be used with increased danger. It cannot be crossed without danger, nor without the exercise of great care. Wheels and axles of vehicles

. are being constantly broken by attempting to drive on its way, or along or across its way, and the only answer which the street railway or the municipality makes to the injured party is, 'Keep off of the track.' . . . Cars moving along these tracks have practically the right of way. They turn out for no one's convenience, and are practically moving obstructions in the street, discommoding other vehicles, and adding materially to the hazard of travel. . . . Because of the existence of these tracks, roadways are being constantly widened at the expense of sidewalks and ornamental grounds and ornamentation. If the local Legislature has the right to permit the laying of a single track, why not of two tracks, or of four tracks. . . . It may be conceded that street car service is a public convenience; but the necessities of the public must be supplied at public expense. The Legislature has no right to say that property of the individual may be taken or injuriously affected for the public good without compensation. Public convenience is not to be subserved at the expense or disadvantage of the private citizen. . . . The same cases which hold that a horse railway is a proper use of a street declare that a steam railway is not, and that the occupation of a street by a steam railway is a new servitude; yet the use by the steam railroad is within the same limits as that of the horse railroad. The burden may not be as great in the one case as in the other; but there is no difference in the principle. . . .

"It is urged that this use of streets 'must be supposed to have been contemplated.' Is it possible that a use of a street which is not common to all streets, and which depends upon the desire of a street car company or the will of a common council, must be supposed to have been contemplated? Can this special use, depending upon the question of profit to its promoters, be deemed to be one of the ordinary purposes for which property for a street was taken? Can it be that the use of a street, as a mere outlet for a traffic which in the absence of that use would be distributed over several streets, can be said to be a use contemplated

at the opening of that street? It is true that all the traffic of a given territory embracing a number of streets may be directed upon a given street, and a system of transportation adopted which interferes with the other and ordinary modes of travel upon that street, and the other streets relieved at the expense of that street, and yet this system of transportation is not a new burden. In a street opening procedure, the measure of damages is the value of the property taken and the physical injury to what is left; but in the condemnation of lands for railroad purposes another element of damages is considered, viz., the consequential injury to the remaining estate growing out of the mode and nature of the use. The very existence of these different rules clearly indicates that, in the street opening proceedings, no possible consequential injury was contemplated. . . . This is not a question of whether or not the public shall shall have street railways or rapid transit; but it is one as to whether the owners of property shall be divested of its beneficial use or enjoyment without compensation, because a private corporation is attracted by the prospective revenue there is in the enterprize, and, upon the plea that it will be a great public convenience, has obtained a franchise to appropriate a portion of the street to its use. . . . The public need and are benefited by steam railroads. The progress of civilization would be checked, and the world at a standstill, without them; but they have never been allowed to acquire private property, except by purchase or condemnation. But here is an electric railway company permitted to take private property without consent or condemnation, and the landowner is powerless to prevent it; and it is doubtful, from the opinions of some of the learned judges who have upheld such proceedings, if he can even seek relief, after the road is laid and operating, in a court of law, for the actual damages he has suffered. In my opinion, no legislative grant, or municipal authority under such grant, can thus deprive an individual of his interest in land, no matter how urgent the wants of the public. The need of the public cuts no figure when the question

of compensation to the landowner for the taking of his property is mooted. . . . The individual, in a republican form of government, is the one to be protected and guarded, and in his protection lies the security of liberty to the whole people. If the need of public demands this kind of a railway for rapid transit, then the public can afford to pay for the privilege of destroying the property of the individual citizen. In no other case that I know of has the home of the individual been permitted by the law to be damaged without recompense, that the public might reap a benefit. If the need of the public is such that it must have this particular method of transit, that need will furnish corporations with the means to repay every private citizen for the loss and damage that his property must suffer to accommodate such public need."

The error into which the courts have fallen, in our judgment, is the error of holding that a street railway was a legitimate use of the street. Such means of street travel differ from all other ordinary uses of the street. There can be no difference between the damage done by a steam railway and a street railway, save in the degree of the damage. We have no hesitancy in holding that a street railway is an additional servitude on the street, entitling an abutting owner to additional compensation, and it can make no difference in principle whether the street be broad or narrow, except as to the extent of the damage. In the one case it may be great, and in the other so small as not to be material; but the principle is the same. This additional servitude is imposed by each line or switch that may be laid in the street, and is a new, additional servitude, just as the number of tracks are multiplied. We do not intimate what the amount of recovery should be in this case, but leave this question open.

*Reversed and remanded.*

After the delivery of the foregoing opinion an elaborate suggestion of error was presented by counsel for appellee. Pending the suggestion of error the cause was remanded for argument.

Argued orally on suggestion of error by *J. Q. Hall,* for appellant, and *C. H. Alexander* and *W. E. Baskin,* for appellee.

WHITFIELD, C. J., delivered the final and controlling opinion of the court, in response to the suggestion of error.

Twelfth Avenue, the one involved in this litigation, as shown in the original opinion, is only forty feet wide from property line to property line. The sidewalk on one side is eight feet wide, and the sidewalk on the other side is nine feet wide, leaving a space for the street proper of only twenty-three feet, down the center of which the railroad company laid its line. The electric car occupies a space of eight feet in the center of the street, leaving a space of about six feet two inches between the body of the car and the curb. A standard guage wagon is shown by the evidence to be about six feet from the outer-edge of the hubs to the outer-edge of the hubs, and thus there is left a space of about only two inches between the car and a wagon when passing each other on the street. Mrs. Slaughter owns an entire block abutting on this street, except about seventy-two feet owned by a abutting party; Mrs. Slaughter's frontage being about two hundred seventeen feet on this avenue. On the 12th of July, 1906, Mrs. Slaughter filed a bill in the chancery court, seeking to restrain the railway company from operating its road on Twelfth Avenue until the company had compensated her for the damage done her property by the street railway, and further, for damage claimed for certain excavations alleged to have been made by the company. This last claim for damages may be laid out of view since, according to the testimony, it is not shown that these excavations had actually been made by the electric railway company.

This simple statement, showing there are but two inches of space between the body of the car and the hub of an ordinary standard wagon, demonstrates beyond any cavil the fact that the laying of the street railway on this avenue in this manner practically destroys the use of the avenue for all purposes except this street car use, and that consequently the construction of this

street railway in this avenue, under the case made by the facts recited above, is a nusiance, seriously interfering with the ingress to and egress from the property of the appellant, inflicting upon her, therefore, special damages, for which she has, under the general principles of the law, a right to recover. The chancellor was in error in holding, on these facts, that the appellant was not entitled to recover these special damages. *"Res ipsa loquitur."* The situation speaks for itself. The distinction to be observed here is between the use of a street and the abuse of it. The construction of this electric street railway in this avenue, leaving but two inches of space, destroying in effect all other use of the street than that use the street railway could have, was a grossly improper construction of the said railway. If it should be conceded that the laying of an electric street railway, generally and ordinarily, in the streets of a city, is not the imposition of a new servitude, and is a legitimate use of a street, it does not at all follow from this concession that such a railway may be laid in a street where the consequence is the destruction of all other use of the street, except that by said street railway. The width or narrowness of the street is a very important consideration in determining, in this view, whether an abutter suffers special injury from the construction of such railway; but in the view as to whether, generally and ordinarily, the laying of an electric street railway in the street of a city is a new servitude, the width and narrowness of any street is wholly immaterial. However legitimate a use of the streets of a city by an electric railway may ordinarily be and however clear it may be that such laying of an electric street railway in the streets of a city ordinarily does not impose any new servitude, is just as clear that such electric street railway cannot be laid in a street where the result is the absolute destruction of the use of said street by all others than said street railway. In other words, it is plainly, in such case, an abuse of a legitimate use, which, if inflicting special damages, must give a right to recover such damages on the general principles of the law.

We do not think, upon mature reflection, that the question

whether the laying of an electric street railway in the streets of a city, ordinarily and as they are generally laid, is the imposition of a new servitude, is presented for decision by this record. The only question properly and necessarily presented for decision in this case is simply whether this appellant has sustained such special damages by serious interference with ingress and egress to and from her lot, by the proper construction of this railway as entitled her to recover, even if it were granted that the laying of such electric street railway in this street did not impose an additional servitude. Because it may be clear, according to the authorities, that the laying of a street railway in the streets of a city in a proper way, not involving an abuse of the streets, does not impose a new servitude, it does not in any manner follow that the improper laying of a street railway, under circumstances such as are shown in this record, does not constitute an abuse of a legitimate use, amounting to a nuisance, for which the injured abutter may recover such damages as the evidence shows. We are therefore clearly of the opinion, without regard to the question whether the laying of a street railway is ordinarily a new servitude, as to which we now say nothing, since we do not regard it as necessarily presented for decision, that Mrs. Slaughter, the appellant, is entitled to recover special damages in this case.

Wherefore the suggestion of error is sustained to the extent of withdrawing the former opinion but the decree of the chancellor is reversed, for the reasons herein indicated above, and the cause remanded.

*Reversed and remanded.*


MAYES, J., delivered the following concurring opinion in response to the suggestion of error, concurring in the result only.

My view of the law applicable to this case is found in the original opinion. I do not think the suggestion of error ought to be sustained in any particular. The majority opinion makes

the same disposition of the particular case as was made by the original opinion, and in so far as it does that I concur in the result, but not in the reason assigned for the reversal. Under sec. 17 of Constitution of this state, and adhering to the former construction of this section of the Constitution as announced by this court, it is my view that it must be held that a street railway imposes an additional burden on the streets to the extent of enabling any abutting property owner damaged thereby to recover such damage as he may sustain.

The original opinion is directed to be set out in the record of this case, containing all authorities I rely on.